## Wytheville.

NORFOLK & WESTERN RAILROAD CO. V. LIPSCOMB.

JULY 6th, 1893.

PASSENGERS—*Detention—Loss of Baggage.*—Passenger with wife and two children, one very sick, bought at B. tickets to W. and was assured by defendant's officials that a through sleeper was attached to the train. Entering sleeper, he paid for two berths, and was assured by its conductor that it would go through. Suddenly, without notice to him, sleeper was cut loose, and the train went on carrying off his baggage, including the child's clothing and medicine, part whereof was lost. Sleeper was left on the track at night when it was too late to get into a hotel or drug store. This distressing situation was produced by the negligence of the defendant's officials, of whom said conductor was one.

HELD:

> Defendant is liable to plaintiff in an action for the retention and loss of baggage, in damages to an amount equal to the value of the property and the time lost, but not to punitive damages.

Error to judgment of circuit court of Washington county, rendered at the April term, 1892. The action was trespass on the case for certain alleged grievances committed by the plaintiff in error against the defendant in error, who was a passenger upon the road of the said plaintiff in error, and who by misdirection embarked upon a coach which was cut out of the train without notice.

Upon the trial the plaintiff recovered a verdict for $500, and the defendant moved the court to set aside the verdict and grant a new trial, which motion the court overruled and rendered judgment on the said verdict.

Whereupon the defendant company applied for and obtained a writ of error to this court.

*Fulkerson, Page & Hurt,* for plaintiff in error.

*T. N. Williams* and *George W. Ward,* for defendant in error.

LACY, J., delivered the opinion of the court.

This case is as follows: The plaintiff testified as follows: My child had been very sick for two or three weeks, and the doctors advised as soon as we could, as soon as it got better, to move from Big Stone Gap to our home, and on their advice we made this move. I knew the running of the trains—I had traveled it frequently. The S. A. & O. train got into Bristol between five and six o'clock, and the train I expected to go on left somewhere about eleven o'clock that night. We went to the hotel and stayed there until about time for this train to leave Bristol, probably about twenty minutes before schedule time, and then I went to the ticket office and purchased two tickets from the ticket agent, Mr. Bradley. I knew him well, and I asked Mr. Bradley if there was a sleeper going through over the Shenandoah Valley railroad, and he stated that there was a sleeper coming in on the Tennessee road that would go on through, and I purchased these tickets, and he advised me to get on this train, which was already made up on the side track, and remain there until the East Tennessee train came in; that it would be fifteen minutes, may be twenty minutes or twenty-five, till that train came in, and when that train came he stated that the sleeper would be attached at the rear; after it was attached we started back to the sleeper. I had the little boy that was sick and my wife had the baby, so we couldn't carry the bundles and the hand-bag, valise, &c., that we had. We went back through three or four sleepers, I don't remember which, and I inquired at the door of each car for the sleeper

going over the Shenandoah Valley railroad. They said that this sleeper was on this train, to pass on through until "you find it." I think I went through two or more cars, and the third or fourth one was the Shenandoah Valley sleeper. The conductor was standing on the platform of the car just at the door. When we passed out of the first car the train started; as I got into this car (sleeper), it was just moving slowly, I asked if this was Waynesboro Junction sleeper going over the Shenandoah Valley railroad, and will it go through, and the conductor said yes, we are going through. I purchased two tickets for berths, and paid him $2 apiece for them, numbers 5 and 6, lower berths, and I then showed him the other tickets. I went back into the car with the porter, and he showed the berths to my wife, and she and my family stayed in there, and I started back into the other car to get the bundles out of the train, and found that the train had cut loose from this sleeper and was pulling out of the yard. I remarked to Mr. Jones, the Pullman conductor, "I believe we have gotten left," and he said they had orders to throw out a Washington sleeper, and were throwing it out; that they never left a sleeper with passengers in it, and that the Washington sleeper would remain in Bristol, and that sleeper would go out. I remarked from the exhaust of the engine I thought they were leaving, and he said, No, they are throwing out the empty Washington sleeper; they will back in directly and couple to this sleeper. I am not positive just what I said, but did say from the exhaust of the engine I believe we are left, and then he said: "I will be d—d if we ain't," or something of that kind, and stated that he had been running, I don't know how many years, and had never been left that way before. I asked him what was the best thing to do; if there was a telegraph office there; how could I get this baggage that was taken off; that my medicines and all had been left in the coach, and were taken away on that train. He said you had better go and telegraph and have them stopped. I went to the telegraph office,

and I think he went with me.   I telegraphed to the train des-
patcher that I was left there and had a very sick child, and all
the medicine and baggage I had had been carried off on this
train.

The following message was admitted to be the message sent:

BRISTOL, 6–21, '90.

Train Desp'r N. &. W. R. R., Radford:

I was misinformed here to-night in regard to leaving here
on N. Y. sleeper.   Was transferred from one car to the
sleeper said to go through on No. 2.   I have a very sick child
and wife here on the yard in a close sleeper.   This train No.
2 leaves here with no notice to passengers and takes my bag-
gage, all of the medicine and nourishment I had for my wife
and child.   I hold my ticket, and will hold the road responsi-
ble for damages or spend the last dollar I have suing.   My
child is very ill, and can't get a thing for him at this hour of
night.   I have wired conductor to leave things at Abingdon
with no reply; to leave them at Glade Spring, and not left
them.   Can you arrange at any cost, makes no difference how
much, to run me and family to point at which these things are
left.   I am afraid my child will die if he has not the medicine,
&c.   My doctor came with me to this point, but has gone
back.   The things spoken of which are mostly needed are in
the first-class car next to sleeper—a basket with good many
bottles, &c., in it, a small valise and shawl strap, with um-
brella—about centre of car.   Please have them stopped, and
answer this if you please.   3k. a. m.

W. P. LIPSCOMB.

It was also proved that the plaintiff was delayed on the
road, and was obliged to change his line of travel at Roanoke
and go by Lynchburg and Charlottesville to reach his destina-
nation; that his sick child was greatly discomforted, as he
had no change for him, and he was sick.   At Lynchburg the
plaintiff secured some clothing and some food.

The defendant contradicted the testimony of the plaintiff as to the misdirection and misinformation given at Bristol to the plaintiff, but under the law in this State we must consider the evidence as upon a demurrer to evidence by the defendant below, the plaintiff in error here, and so considered. It appears that a passenger with his wife and sick child, and another child an infant, applied at Bristol to the company's agent for a ticket for himself and family to Waynesboro Junction, a point on the defendant's road, obtained it, and paid for it, and was informed that a sleeper was on the train approaching, and that it would go through, and that there were two sleeping-car berths vacant which he could get—Nos. 5 and 6. That upon the arrival of the train he went into this sleeper, obtained and paid for the two berths, and took possession of them. Whereupon, without notice to him, the said sleeper was cut loose and left standing in the night time on the siding, while the train upon which he had engaged and paid for his passage sped on its way without him. The hour was so late that he could not get into the hotel nor into any drug store, and he was left in a very painful situation. That, under the circumstances detailed, his baggage containing the sick child's clothing and medicine was carried off, and the valise containing the clothing and medicine was lost and never recovered. That this was caused by the misdirection and negligence of the company's officers is plain.

The conductor of the sleeping car attached to the defendant's train was an officer of the company, and as to all passengers in his car was such an officer of the company as represented the company, and the company is responsible for his negligence. *Williams* v. *Pullman Car Co.*, 33 Am. & Eng. R. R. cases 414; *Penn. Co.* v. *Roy*, 102 U. S., 452. And there can be no question that the company is liable to the plaintiff in this action for damages for the injury sustained.

But it is not clear that the company can be held to respond in any other measure of damages than such as are compensa-

tions for the actual injury sustained.    The record discloses that
the officers of the company were themselves mistaken, *negli-
gently mistaken* it may be conceded, yet we perceive in the re-
cord no indication of any malicious purpose or evil intent.    It
was an honest mistake, and one much regretted by those in
fault as soon as it occurred, and disclaimed by the company,
and everything within reasonable bounds done to alleviate the
unfortunate condition of the plaintiff.    Such baggage as was
discovered was put off at a station and reclaimed by the com-
pany's servants as the train passed on which the plaintiff ulti-
mately travelled.    The valise was lost and should be paid for,
but that does not appear otherwise than as an accident.

But there was no insult, no disrespect, either before nor
after the sleeper was cut loose.    In this respect this case is to
be distinguished from the late case in this court decided at this
term, of *Norfolk and Western Railroad Co.* v. *Wm. M. Anderson,*
*ante* p. 1.

The court instructed the jury under these circumstances as
follows:

The plaintiff tendered the following instructions:

"The court instructs the jury that in this action they may
find against the defendant *such punitive damages as in their judg-
ment may be proper, provided they believe from the evidence that the
injury complained of by the plaintiff in his declaration accrued
through the wilful negligence and carelessness of the defendant, its
agents and servants;* and the court instructs the jury that for
the purposes of this case the conductor of the sleeping car must
be treated as a servant of this, the railroad company," which
instruction was objected to by the defendant, but the court
overruled said objection and gave the said instruction in the
words above set forth, to which action of the court the de-
fendant excepted, which is its first exception.    And thereupon
the defendant tendered four instructions in the words and
figures following, to wit:

## First.

The court instructs the jury that negligence cannot be presumed, but must be proven, and that the burden of proving negligence by a preponderance of evidence rests upon the party alleging the negligence, and therefore unless the jury believe from the evidence that the defendant negligently failed to attach the sleeping car in question to the train in question they should find for the defendant.

## Second.

The court instructs the jury that if they find from the evidence that the plaintiff was delayed in his journey by the negligent failure of the defendant to attach the sleeping car in question to the train in question, then they are limited in fixing the damages to the actual damages sustained by the plaintiff, which actual damages must be such as are laid in the declaration, and can only find for the plaintiff—

First. Such sum as may be proved to have been expended in completing the journey in question, after deducting therefrom the value of the railroad tickets from Roanoke to Waynesboro Junction, still held by the plaintiff; and,

Second. The amount expended in having the child cured of its illness; and,

Third. The value of the time for which the plaintiff was delayed in reaching his destination, estimating the said time at what the time of the plaintiff was ordinarily worth. But the jury can make no allowance for the amount expended in having the child in question cured of its illness unless they believe from the evidence that the sickness of the said child was caused by the delay of the defendant company in carrying the plaintiff upon said journey.

## Third.

The court instructs the jury that if they believe from the evidence that the plaintiff, at the time in question, purchased

railroad tickets from the defendant, and if they believe from the evidence that the defendant's train for which said tickets were purchased went forward, yet if they believe from the evidence that the sleeping car in question was left at Bristol by negligence of the defendant company, they cannot find for the plaintiff unless they further believe from the evidence that the plaintiff secured tickets upon the said sleeping car before the departure of said train from Bristol.

## Fourth.

And the court instructs the jury that in order to find the defendant guilty of wilful negligence it must appear that the act of the defendant was not in the nature of a mistake, but was an intentional act on the part of the defendant with the intention of delaying the plaintiff in the prosecution of his journey.

And the court gave the first instruction offered by the defendant, and modified the second instruction, and refused to give the third instruction, and modified the fourth instruction, and gave the second and fourth instructions as modified, which were in the words and figures following, to wit:

## Second Instruction as modified and given.

The court instructs the jury that if they find from the evidence that the plaintiff was delayed in his journey by the negligent failure of the defendant to attach the sleeping car in question to the train in question, then they are limited in fixing the damages to the actual damages sustained by the plaintiff, which actual damages must be such as are laid in the declaration, and can only find for the plaintiff—

First. Such sum as may be proved to have been expended in completing the journey in question, after deducting therefrom the value of the railroad tickets from Roanoke to Waynesboro Junction, still held by the plaintiff; and,

Second. The amount expended in having the child in question cured of its illness; and,

Third. The value of the time for which the plaintiff was delayed in reaching his destination, estimating the said time at what the time of the plaintiff was ordinarily worth.

But the jury can make no allowance for the amount expended in having the child in question cured of its illness unless they believe from the evidence that the sickness of the said child was caused by the delay of the defendant company in carrying the plaintiff upon said journey.

But if the jury should find that the agents of the defendant were guilty of wilful misconduct and thereby caused the plaintiff's delay, then they may find, in addition to these actual damages, punitive or exemplary damages.

### *Fourth Instruction as modified and given.*

The court instructs the jury that in order to find the defendant guilty of wilful negligence it must appear that the act was not in the nature of a mistake, but was an intentional act on the part of the defendant's agent, done with the purpose of misleading the plaintiff.

To which action of the court in modifying the second instruction and refusing to give the third instruction, and in modifying the fourth instruction, the defendant excepted, which is its second exception.

And thereupon the jury retired, and after a time returned a verdict, which verdict is as follows:

We, the jury, find for the plaintiff, and assess the damages at $500 (five hundred dollars.)

And thereupon the defendant, by counsel, moved the court to set aside said verdict and grant it a new trial upon the ground that the court had erred in its instructions, and upon the further grounds that the said verdict was contrary to the law and evidence, and that the damage found by the jury was exces-

sive, which motion the court overruled and rendered judgment upon said verdict.

Under the circumstances of this case can the defendant be lawfully held to respond in exemplary or punitive damages?

It was said by Judge Staples, speaking for this court in *Borland* v. *Barrett*, 76 Va. Rep., p. 132: "In a legal sense every unlawful act, done wilfully or purposely, to the injury of another upon slight provocation, is as against such person malicious, and the law so presumes." And this is as strongly as this doctrine could well be stated. It being conceded that this presumption may be rebutted by proof, no malice, nor any evil intent can be presumed from a mistake or misadventure. To state the proposition is to prove it. It is self evident. An absence of evil purpose is an absence of malice. No mere inadvertence, mistake, or accidental occurrence can be malicious, although negligent. And this would seem to be sufficient for this case. And it is scarcely necessary to go into the other question, whether the company is responsible for the malicious act of its employee. In the case of *Lake Shore, &c., Railroad Co.* v. *Prentice*, 147 U. S. S. C. Rep., 101, Mr. Justice Gray reviews this subject and cites many authorities, among them the case of *Hogan* v. *Providence and Worcester Railroad*, 3 Rhode Island, 88, 91, which is highly endorsed. When it is said: "We do not see how such damages can be allowed when the principal is prosecuted for the tortious act of his servant, unless there is proof in the cause to implicate the principal and make him *particeps criminis* of his agent's acts. No man should be punished for that of which he is not guilty. When the proof does not implicate the principal, and, however wicked the servant may have been, the principal neither expressly no impliedly authorizes nor ratifies the act, and the criminality of the act is as much against him as against any other member of society, we think it is quite enough that he shall be liable in compensatory damages for the injury sus-

tained in consequence of the wrongful act of a person acting as his servant."

In this case the instructions are that the jury could assess exemplary, punitive damages against the defendant for the wilful negligent act of the servant or agent.

This is contrary to the plain principles of justice, and the decided cases are to be contrary. Exemplary or punitive damages do not lie in such a case; the amount of damages is not too large, abstractly considered. But when considered in the light of the evidence in this case, they are much beyond any compensatory basis; there was no hurt, nor pecuniary nor other loss which is proved which can be brought by this evidence to this amount. There was delay, vexation, distressing anxieties, and some loss, but the sum of $500 could not have been reached upon any other principle than the ascertainment of punitive damages under the erroneous instructions of the court, which cannot be allowed, the transaction involving neither fraud, malice, oppression, or gross negligence, or reckless indifference to the rights of others.

The jury having been misinstructed by the court as to the law of the case, the judgment must be reversed and annulled, and the case remanded to the said circuit court of Washington county for a new trial to be had therein.

JUDGMENT REVERSED.