## Wytheville.

## HENRY MYERS & COMPANY V. LEWIS.

June 14, 1917.

Absent, Burks, J.*

1. PROCESS—*Verification of Return—Service on Non-Residents.*—
   To a return of process against non-residents was attached an
   affidavit of a notary to the effect that the person serving the
   process appeared before him in person and made oath that
   the statements made in the return were true. The trial court
   correctly ruled that such return was under oath, as required
   by section 3232, Code of 1904, the affidavit accompanying the
   return evidencing the fact.

2. ATTACHMENT—*Motion to Quash—Validity of Demand.*—The ques-
   tion of the validity of the debt or demand of the plaintiff,
   *i. e.,* whether it is or is not established does not arise upon a
   preliminary motion to quash the attachment, but only when
   the case is heard upon its merits. Consequently, the question
   of the liability of a partnership for torts of one of the part-
   ners is not within the scope of a motion to quash an attach-
   ment, but must be determined when the case comes up for
   trial on its merits.

3. MASTER AND SERVANT—*Agency—Partnership—Liability of Mas-
   ter, Principal or Partner for Torts of Agent, Servant or Part-
   ner.*—Where there is neither express authority in advance nor
   ratification afterwards, the test of the liability of the mas-
   ter or principal for the tortious act of the servant or agent,
   is not whether the tortious act itself—the act in the manner
   in which it was done—is a transaction within the ordinary
   course of the business of the master or principal, or within
   the scope of the servant's or agent's authority; but the true
   test is whether, if the act had been done in a nontortious man-
   ner, the service itself, in which the tortious act was done, was
   within the ordinary course of such business or within the
   scope of such authority. That is to say, the true test is, was
   the service, in which the tortious act was done, incident to
   the employment? The master or principal is liable for the
   *tortious manner* in which a transaction is conducted or a ser-

---

*Case submitted before Judge Burks took his seat.

vice is performed by his servant or agent, entrusted by the former to the latter to be conducted or performed for him in a nontortious manner. The same is true, of course, with respect to the liability of a partnership for a tort of an individual partner.

4. PRINCIPAL AND AGENT—*Ratification—Torts.*—Mere ratification is not itself a test of liability of one for the tortious act of another, much less is the receipt of a benefit from the tortious act such test, which in itself does not extend beyond being a circumstance in evidence tending in part to show ratification. Ratification is material as bearing upon the measure of damages, but is not a true test of original liability. The question still remains, was the tortious act committed by the servant or agent in the course of his service or employment?

5. PARTNERSHIP—*Libel and Slander—Liability of Partnership for Libel Published by One of the Partners—Damages.*—A partnership is liable for the writing by one partner, in the course of his conduct of the correspondence of the firm entrusted to him to conduct in a nontortious manner, of a libelous letter, for the purpose of obtaining from the recipient the payment of an alleged debt due the partnership. The tortious act complained of was incident to the employment, *i. e.,* within the ordinary course of the partnership business, within the scope of the authority of the acting partner, and, hence, the firm was liable for compensatory damages for the tortious manner in which the latter conducted such correspondence.

6. INSTRUCTIONS—*Not Based on the Evidence.*—An instruction is properly refused, where there is no evidence to support it, and it is contrary to all the evidence on the subject.

7. PARTNERSHIP — *Libel and Slander — Exemplary Damages.*— Where an innocent partner subsequently ratified the tortious act of his partner in publishing a libel, the partnership is liable for exemplary or punitive damages.

8. PARTNERSHIP—*Libel and Slander—Exemplary Damages—Appeal and Error—Harmless Error.*—In an action against a partnership for a libel written by one partner, the court instructed the jury that if they believed from the evidence that the letter was written with actual malice, and the defendants were liable, they might award exemplary damages against the partnership. As an abstract proposition, this was error, as the partnership would be liable for compensatory damages only, unless the act of the guilty partner was previously authorized or subsequently ratified by the other partner. But as in the instant case the tortious act was subsequently ratified by the innocent partner, the error was harmless.

9. APPEAL AND ERROR—*Invited Error.*—Where an error of the trial court in instructing the jury as to the liability of defendants for exemplary damages was invited by an instruction asked

for by the defendants and given by the court, containing the same error, and the case was tried in the court below on this point, as asked for by both parties, defendants as well as plaintiff, it is too late for the defendants to avail themselves of the error in the appellate court.

10. APPEAL AND ERROR—*Harmless Error.*—If it does not affirmatively appear that the error in question is injurious, it must be regarded as harmless.

11. LIBEL AND SLANDER—*Damages.*—Where a libel is actionable *per se,* plaintiff is entitled to recover substantial, and even punitive damages, without any proof of particular instances of special damage. The law presumes general damages where the libel is actionable *per se.*

12. LIBEL AND SLANDER—*Damages—Cross-Examination.*—If defendants, in an action for libel, are not content to let the case stand upon the general damages presumed by law, but wish to rebut this presumption by questioning plaintiff on cross-examination as to what actual injury plaintiff had in fact sustained by the libel, they have the right to do so, in diminution of damages. But having asked the question, they cannot object to an answer in direct response to the question.

Error to a judgment of the Hustings Court, Part II, of the city of Richmond, in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

STATEMENT OF THE CASE AND FACTS BY SIMS, J.

This is a civil action of J. H. Lewis, a retail merchant, defendant in error (plaintiff in the court below) against the plaintiffs in error (defendants in the court below), a manufacturing and mercantile partnership, composed of two partners, Louis Jandorf and Sydney Greenbaum, for damages for a libel contained in a certain letter written to the said Lewis by one of said partners, signing the partnership name to the letter, in the absence of and without the knowledge of the other partner of this particular act at or before it was done, and an ancillary attachment at law.

The declaration contains two counts, one laying the action at common law for libel affecting the plaintiff, Lewis,

in his trade and business, the other under the statute in Virginia for insulting words.

The letter was as follows:

                    "Baltimore, Md., August 11, 1913.
"J. H. Lewis,

        "Dear Sir:

"The two cases of shirts which you returned we have instructed the R. R. Co. to put same in the public storage warehouse in Baltimore, and when the bill comes due we will look to you for payment of same, and if bill is not paid when due we will place with our attorney, Ellis Stern, in Richmond, and will put you before the merchants the class of man which J. H. Lewis is, and it will be Henry Myers & Co. who will do so, as we think you are one of the most unprincipled merchants in Richmond. We do not want to sell you any more, and have instructed our salesman not to call on you.

                "Respectfully yours,
                    (Signed)      "'Henry Myers & Co.'"

This letter was written by the defendant partner, Louis Jandorf, in the absence of the other defendant partner. Jandorf was intrusted with the conduct of the partnership correspondence in the absence of his partner. The letter was written, as appears from the letter itself, with *the purpose* of benefiting the partnership, in that its object was to induce the payment by the plaintiff Lewis of a bill for goods sold and shipped to him by the defendant partnership. It was written in the ordinary course of business—in the ordinary conduct of the correspondence—of the partnership. It was written in the name of the partnership—the latter being signed thereto. The further threat and proceeding to put plaintiff "before the merchants the class of man" he was said in the letter to be, was to be done by the partnership, according to such letter. The writing of the letter

itself was within the partnership authority of Jandorf but the manner in which he wrote it, in this, his use of the libelous words therein, was an act in excess of his partnership authority, in the sense that the partnership was not organized to, nor was it ever within the contemplation of the partners that it would, engage in the business of writing libels or in committing any other tort.

There were other letters, both of plaintiff, Lewis, and the defendant partnership, written to each other, before and after the letter above copied, which are immaterial to the decision of the case upon the points presented to us by the assignments of error. There is one other letter which is material, however, written on September 4, 1913, twenty-four days subsequent to the letter above copied. Such other letter is as follows:

"September 4th, 1915.

"Mr. J. H. Lewis,
          Richmond, Va.;
"Dear Sir:

"We are informed that you have been going around Richmond to all our customers, stating that you are suing us for $10,000.00. If you wish to sue us it is your pleasure, but we will say now, once for all, that the bill of goods which we shipped you is now in our warehouse in Baltimore, and when the bill is due we shall expect payment of the same. If same is not paid we will enter suit against J. H. Lewis. We cannot sue now as this bill is not due. We have the affidavits of those customers of ours regarding the statement which you have made. We have our rights and we are going to stand by same, and when we write you we write facts, and what we state we mean. If you wish goods shipped to you they are in our warehouse here, and you can have same

recalled. The attorney who will have charge of this case will be S. S. P. Patteson. If you are looking for trouble you will certainly get it.

"Respectfully yours,

(Signed)      "Henry Myers & Co.,

"L. J."

This letter also was written by Jandorf. It practically ratified and reiterated what was said in the letter of August 11, 1913.

Upon the question of whether punitive or exemplary damages are recoverable in this case against the partnership, it becomes important to ascertain what the facts were with reference to the knowledge and approval on the part of the partner Greenbaum of the letter of September 4th.

*The evidence on this question of fact is conflicting.*

There is the positive statement of Jandorf, that Greenbaum had not returned to Baltimore when the letter of September 4th was written. There is also testimony to the effect that Greenbaum was absent from Baltimore and the place of business of the partnership, from August 8th or 9th, until "the first week in September," and then on his return he heard of the threatened suit of the plaintiff and "during the first week in September," when "he had just returned," he read over the correspondence aforesaid on file in the office of the partnership, and there saw the letter of August 11, 1913, and expressed his disapproval of it, stating to his stenographer, in the presence of Jandorf, "that if he had been in the city when the letter was written he would not have permitted it to have been written." But while Greenbaum testified in the case, he does not say he did not know of the contents of the subsequent letter of September 4th. (Greenbaum does testify that when not absent from the city, he was, by express partnership agreement, in actual charge of all correspondence.) Jandorf himself testified that after his partner Green-

baum saw the correspondence prior to September 4th and expressed his disapproval of the letter of August 11th, the latter left it to Jandorf to conclude the correspondence with the plaintiff, which was done by the letter of September 4th. Besides Jandorf testified positively, and Greenbaum does not deny, that Greenbaum and himself decided on employing Mr. Patteson to defend the suit of plaintiff—that this was done after Greenbaum had been informed of the threatened suit, which was not until after Greenbaum returned to Baltimore as aforesaid. Now the letter of September 4th bears indisputable internal evidence that the employment of Mr. Patteson had been "decided on" before that letter was written. There was evidence before the jury, therefore, which would have warranted them in concluding that Greenbaum knew and approved of the letter of September 4, 1913, and hence, although he expressed disapproval of the letter of August 15, 1913, did in fact afterwards ratify and approve of the position taken therein. In the letter of September 4th, it is said, "We have our rights, and we are going to stand by same, and when we write you we write you facts and what we state we mean."

There were two preliminary questions raised in the progress of the case in the court below, which are presented to us for decision by the assignment of error, namely:

Whether the return of personal service of the process commencing the action was under oath, as required by section 3232 of the Code of Virginia?

Whether, on motion of defendants to quash the attachment on the ground that "One partner cannot bind another by his tortious acts," and depositions were tendered by defendants proving, as they alleged, that there was no authorization or ratification of the tort by the other partner, the court below should have acted on and sustained such motion on such ground before the case was matured for hearing on its merits.

On the first question, the facts were as follows:

There was the following return on the said process:

"Executed by delivering a true copy of the written summons to Louis Jandorf and Sydney Greenbaum, non-residents of the State of Virginia, in person, on the 19th day of September, 1913, at 9:40 o'clock A. M., in the city of Baltimore.

"Given under my hand this 19th day of September, 1913.

(Signed)      "Charles Klinejohn."

To this return is attached an affidavit of a notary to the effect that Charles Klinejohn appeared before him in person and "made oath that the statements made in the foregoing return are true."

The trial court decided both of these questions adversely to the defendants.

There was a trial by jury in the court below; a verdict and judgment for the plaintiff, Lewis, for the amount of $750.00.

The remaining assignments of error involve the action of the trial court in

Giving and refusing instructions;

Admitting certain testimony over the objection of the defendants; and

Refusing to set aside the verdict of the jury and grant the defendants a new trial.

### THE INSTRUCTIONS GIVEN AND REFUSED.

The instructions asked for by the plaintiff were given as asked, over the objection of the defendants, and were as follows:

Instruction No. 1.—"The court instructs the jury that the members of a partnership are liable for the wrongful acts of a partner while he is acting in the ordinary course of the

firm's business, and if you believe from the evidence that the letter complained of in the declaration, was written by one of the partners while the other partner was out of the city, and that all correspondence in reference to the business of the partnership was left in the hands of the writer of the letter, and that the said letter was written within the scope of the authority of the partner writing the letter, then you must find for the plaintiff against the defendants, if you believe from the evidence that the words used in said letter were from their usual construction and common acceptation construed as insulting and tending to violence and breach of the peace."

Instruction No. 2.—"The court instructs the jury that though you may believe from the evidence that the letter referred to in the declaration has done the plaintiff no permanent injury, yet, if you believe from the evidence that the letter was written with actual malice, and that the defendants are liable, then you may award damages not only for any temporary injury, but also as exemplary damages to deter the defendants and other parties from a repetition of the offense. *Tyree* v. *Harrison,* 100 Va. 542, 42 S. E. 295."

The instructions asked for by the defendant were as follows:

Instruction No. 1.—"The court instructs the jury that if they believe from the evidence that the letter sued on was the personal act of Mr. Jandorf, and outside of the scope of the partnership business, and written by him because he felt angered and aggrieved at what he conceived to be the bad treatment of the partnership by the plaintiff, they must find for the defendants."

Instruction No. 2.—"The court instructs the jury that if they believe from the evidence that the alleged libelous letter was written by Louis Jandorf during the absence of Sydney Greenbaum and without his knowledge or consent, and that Sydney Greenbaum did not subsequently ratify

the act of Louis Jandorf in writing this letter and that the firm of Henry Myers & Company did not receive a benefit by the writing of the letter, then they must find for the defendant."

Instruction No. 3.—"The court instructs the jury that a partnership is not liable for the wrongful act of one of the partners unless the other partner participates in the act, or authorizes the doing of the act, or ratified it after it was done, or received some benefit from it, or unless the act was within the usual and ordinary scope of the partnership business."

Instruction No. 4.—"The court instructs the jury that a recovery against the partnership will be limited to the actual injuries suffered by the plaintiff, and that the punitive or exemplary damages may not be assessed against the partnership for the wrongful act of one of the partners."

Instruction No. 5.—"The court instructs the jury that should they find for the plaintiff, they may assess against the defendants such damages as they think proper under all the circumstances of the case. That in assessing damages, they may take into consideration motive and intent of the defendants, the extent of publication and may determine in view of all the evidence whether punitive damages should be allowed."

Instruction No. 6.—"The court instructs the jury that punitive damages may be awarded only in case the publication was made with actual malice on the part of the defendants for the plaintiff, and that the presence or absence of actual malice is to be determined by the jury taking into consideration all of the evidence in the case."

The court refused to give instructions Nos. 1 and 4 asked for by defendants; gave, as asked, such instructions Nos. 3, 5 and 6: modified such instruction No. 2 by adding the words, "and not within the scope of his authority," so that such instruction as given read as follows:

"The court instructs the jury that if they believe from the evidence that the alleged libelous letter was written by Louis Jandorf during the absence of Sydney Greenbaum and without his knowledge or consent *and not within the scope of his authority*, and that Sydney Greenbaum did not subsequently ratify the act of Louis Jandorf in writing this letter, and that the firm of Henry Myers & Company did not receive a benefit by the writing of the letter, then they must find for the defendant."   (Italics supplied.)

## THE ADMITTED TESTIMONY, OBJECTED TO.

This testimony, the objection and ground of it and the ruling of the court thereon will most succinctly appear from defendants' bill of exceptions to No. 5, which, so far as material is as follows:

Bill of Exceptions, No. 5.—"* * * during the examination of the plaintiff, J. H. Lewis, as a witness on his own behalf, counsel for defendant, with the purpose of ascertaining generally the nature of the damages, if any, suffered by the plaintiff, asked the following question on cross-examination:

"Q. Can you state in what way you have been injured by the letter you received from Henry Myers & Company?"

"To which question the witness replied:

"A. Well, gentlemen, I don't know direct, but indirect, I have been injured a great deal.  For instance, I have been buying goods from North Brothers and Strause.  I have bought from them, as much as four or five hundred dollars worth at a time, and I received the goods and everything was O. K."

"To which answer of the witness, the defendant, by counsel objected, stating that plaintiff could not give testimony as to special damages as no special damages were alleged in the declaration, and the court overruled the objection of the defendants, and allowed the evidence to go to

the jury, it being of the opinion this could not be considered as evidence of special damages, but could be considered as a part of the plaintiff's case which he had a right to prove under his declaration, and allowed the witness to continue his answer as follows:

"Their salesman came along and I bought some goods from them, and then in three or four or five days, I got a letter saying 'Mr. Lewis, we have received your order and are very sorry to say that we cannot now ship the goods. We will be glad to sell you goods provided you send us check for the same.'

"To which action of the court in overruling defendants' objection to the testimony offered, and allowing witness to give the aforesaid evidence, the defendants by counsel, excepted, etc."

*S. S. P. Patteson* and *Duval & Duval,* for the plaintiffs in error.

*L. O. Wendenburg,* for the defendant in error.

SIMS, J., after making the foregoing statement delivered the opinion of the court.

With regard to the two preliminary questions above referred to, we deem it sufficient to say:

With reference to whether the return on the process above quoted was "under oath" as required by section 3232 of the Code of Virginia:

We think the trial court correctly ruled that such return was under oath as required by the statute referred to, the affidavit accompanying the return evidencing that fact.

With reference to whether, on motion of defendants to quash the attachment on the ground that "one partner cannot bind another by his tortious acts," accompanied by tender of depositions which the defendants claimed showed

that there was no authorization or ratification of the tort by the other partner the court below should have acted on and sustained such motion on such ground before the case was matured for hearing on its merits:

We think the trial court was also correct in its ruling on this question. The question of the validity of the debt or demand of the plaintiff, *i. e.*, whether it was or was not "established did not arise upon a preliminary motion to quash the attachment but only when the case was heard upon its merits." Section 2981, Code of Virginia. Therefore the court below properly ruled that "the questions of liability of the partnership for the torts of one of the partners is not within the scope of the motion to quash the attachment, but would have to be determined when the case came up for trial on its merits," and hence properly overruled the motion aforesaid.

Coming now to the consideration of the action of the trial court involved in the remaining assignments of error.

It seems that the instant case is one of first impression in this court on the subject of the liability of a partnership for a libel published by one of the partners.

We will take up and pass upon the subjects involved in the assignments of error in their order as stated below.

Giving and refusing instructions.

1. The court below committed no error in giving instructions No. 1 asked for by the plaintiff. It correctly propounded the law as it has been well settled in principle since as early as the time when Lord Holt was Chief Justice of England. *Hern* v. *Nichols,* 1 Salk. 289. The latter was a case of agency; but the liability of a partnership for the acts of an individual partner, *in delicto,* as it has been well settled also from the earliest times, rests on the doctrine of agency. Story on Part. (5th Ed.) Sec. 166; *Linton* v. *Hurley,* 14 Gray (Mass.) 191; *Locke* v. *Stearns,* 1 Met. (Mass.) 560, 35 Am. Dec. 382; *Lothrop* v. *Adams,* 133 Mass., 471, 43 Am. Rep. 528. Indeed the liability of a partnership in

such case rests precisely upon the same principle as the lia-bility of a corporation for the torts of its agents or em-ployees, whether of malfeasance or non-feasance, *Mackey* v. *Commercial Bank,* L. R. 5 P. C. 394, a case of fraud by employee of a corporation; *Swift* v. *Winterbotham,* L. R. 8 Q. B. 244, a case of fraud by employee of a corporation; *Stockton* v. *Frey,* 4 Gill (Md.) 406, 45 Am. Dec. 138, where the tort of the individual partner consisted of negligence; *Atlantic Glass Co.* v. *Paulk,* 83 Ala. 404, 3 So. 800, a partnership case; *Read* v. *Home Savings Bank,* 130 Mass., 443, 39 Am. Rep. 468, a corporation case; and many other authorities on this subject too nume-rous to cite. The doctrine in the law of negligence of the liability of the master for the negligence of his servants, as well as the doctrine of the liability of the master for the malfeasance—the active torts—of his servants, and the great bodies of law which have been built upon these sub-jects, rest alike upon the same foundation—the doctrine of agency.

The most difficulty in holding a master or principal liable for a tort by his servant, or agent, where a specific actual intention or purpose is necessary for its commission (the tort being neither expressly authorized before its commis-sion nor ratified afterwards by the former), was experi-enced by the courts in the case of corporations, where it was first doubted whether there could be present, in such an act by an agent or servant, the personality necessary to act-ually will and to do,—to commit an active tort; and too, the *ultra vires* doctrine in such case gave difficulty. *Maynard* v. *F. F. Ins. Co.,* 34 Cal. 48, 91 Am. Dec. 672, and *Id.,* 47 Cal. 207, a case where a corporation was held liable for a libel published by an employee. But as was said in *Read* v. *Home Savings Bank, supra,* "for a quarter of a century corporations have been held liable in tort actions, both for non-feasance and malfeasance." · To the same effect see *Railroad Co.* v. *Quigley,* 21 How. 202, 16 L. Ed. 75 (a case of an action against a railroad company for libel, where it is

said "for acts done by the agents of a corporation, either in *contractu or in delicto,* in course of its business and of their employment, the corporation is responsible as an. an individual is responsible under similar circumstances;") also *Washington Gas Light Co.* v. *Lansden,* 172 U. S. 534, 19 Sup. Ct. 296, 43 L. Ed. 543, where a corporation was held liable in an action against it for libel; and *Sun Life Ins. Co.* v. *Bailey,* 101 Va. 443, 446, 44 S. E. 692, holding a corporation liable in such an action.

The difficulty, as has been often remarked, lies not in the uncertainty of the principle we are considering, but in its application. This difficulty, and as we think, the key to its solution in the instant case, will be disclosed by the illustrations afforded by the quotations we make below from some of the leading cases on this subject.

In *Barwick* v. *English Joint Stock Co.,* L. R. 2 Exch. 259, (which was an action *in delicto* against a corporation for the fraudulent concealment and misrepresentation of one of its servants), Willis J. in delivering the opinion of the court said:

"With respect to the question, whether a principal is answerable for the act of his agent *in the course of his master's business,* and for his master's benefit, no sensible distinction can be drawn between the case of fraud and the case of any other wrong. The general rule is that the master is answerable for every such wrong of the servant or agent as is committed *in the course of his service* and for the master's benefit, though no express command or privity of the master be proved. (See *Laugher* v. *Pointer,* 53 &c. 547, 554, 11 E. C. L. R. —.) That principle is acted upon every day in running down cases. It has been applied also to direct trespass to goods, as in the case of holding owners of ships liable for the acts of masters abroad, improperly selling the cargo. (*Ewbank* v. *Nutting,* 7 C. B. 797, 62 E. C. L. R. —.) It has been held applicable to actions of false imprisonment, in cases where officers of railway companies

intending to act in the course of their duty, improperly imprison persons" (citing a number of English cases).  "It has been acted upon where persons employed by the owners of boats to navigate them and to take fares, have committed an infringement of a ferry, or such like wrong.  (*Huzzy* v. *Field,* 2 C. M. & R. 432, 440).  In *all these cases it may be said,* as it was said here, *that the master has not authorized the act.  It is true, he has* not authorized *the particular act,* but he has put the agent in his place to do *that class* of acts, and he must be answerable for the *manner* in which the agent *has conducted himself* in doing the business which it was the act of the master .to ·*place him in.*"    (Italics supplied.)

In *Mackay* v. *Commercial Bank,* L. R. 5 P. C. 394, (which was an action for deceit ·for false and fraudulent representation contained in a telegram sent by the cashier of the defendant bank). · The cashier "kept the books, conducted the correspondence and prepared the telegrams of the bank." It is said in the opinion in that case:

"\* \* \* It is seldom possible to prove that the fraudulent act complained of was committed by the express authority of the principal, or that he gave his agent general authority to commit wrongs or frauds.  Indeed, it may be assumed that, in mercantile transactions, principals do not authorize their agents to act wrongfully, and consequently that frauds are beyond 'the scope *of the agents' authority' in the narrowest sense of which the expression admits.  But so narrow a sense would have the effect of enabling principals largely to avail themselves of the frauds* of their agents, without suffering losses or incurring liabilities on account of them, and *it would be opposed as much to justice as to authority.  A wider construction* has been put upon the words.  Principals have been held liable for frauds where it has not been proved that they authorized the *particular fraud* complained of or *gave a general authority to commit frauds;* at the same time, it is not easy to define with precision the extent to which this liability has been carried.

The best definition yet, in their Lordship's judgment, is to be found in the case of *Barwick* v. *English Joint Stock Bank"* (which is quoted above) "where the judgment of the Exchequer Chamber was delivered by one of the most learned judges who ever sat in Westminster Hall." (Italics supplied.)

After quoting from the case last named, the opinion in *Mackay* v. *Commercial Bank, supra,* continues:

"This doctrine was acted upon lately by the court of Queen's Bench, in *Swift* v. *Winterbotham,* Law Rep. 8 Q. B. 244 where they held a banking company liable in respect of a fraudulent guarantee by their manager * * * although the bank derived no benefit from the representation. This judgment was, indeed, reversed in the Exchequer Chamber on the ground that the signature of the manager was not the signature of the company within the words of 9 Geo. 4, C. 14, S. 6, and that the representation was made by the manager only in his individual capacity, but Lord Coleridge, in delivering the judgment, observes, ' This does not at all conflict with the case of *Barwick* v. *English Joint Stock Bank,* * * * and cases of that description, because there can be no doubt that where an agent of a corporation, or joint stock company, *in| conducting its business,* does something of which the joint stock company take advantage, or by which they profit, or *by which they may profit,* and it turns out that the *act* which is done by their agent is a fraudulent *act,* justice points out, and authority supports justice in maintaining that they cannot afterwards repudiate the agency, and say that the *act which has been done* by the agent is not an act for which they are liable." (Italics supplied).

In *Dunn* v. *Hall,* 1 Ind. 344 (where Watts and Dunn were the owners of a newspaper plant) Dunn, the part owner and publisher of the newspaper was held liable for a libel published in his newspaper, although he, before the publication, expressly forbade the agent left in charge of the publication of the paper from publishing the libel, and Watts,

before such publication, expressed disapprobation of it. The court in their opinion in this case said: "* * *if Dunn, the owner and publisher of the paper, chose to leave his home and place his paper in charge of another person, he is responsible *for the conduct* of the person he so employed: the person so engaged is the owner's agent in *that business* and he must be chargeable no matter what private instructions he may have given him; so, if Watts is a joint owner of the concern and chooses to permit Dunn to edit it, or any other person, he too, is responsible for the conduct of Dunn or such other person so employed. We do not think that the publication having been made against the express disapprobation of Watts, is, of itself, sufficient to discharge him, if, by the exercise of due and proper diligence he could have prevented the publication. If he chose not to oversee the publication of his paper, but to trust it to others, he must be held responsible to the public for the conduct of those he employs, even if his agent does make a publication which he had forbid." (Italics supplied).

The court then refers to the line of cases and authorities on the subject of the liability of owners of newspapers for libels printed therein *"in the ordinary course of their business"* without the actual knowledge or approval or possibility of it, on the part of the owners, on account of their absence, etc. See also Bac. Ab. Lit. Libel 458; 2 Stark on Slander, 29 notes, Wend. Ed., as to liability of book-sellers for libel when a book or pamphlet containing a libel is sold by them *in the usual course of trade,* in ignorance of its contents; *Rex* v. *Gutch,* 1 M. & M. 433, where the owner of the newspaper who lived more than a hundred miles from the place of business of the newspaper, was held criminally liable for the printing therein of a libel, in which Lord Tenterdon, Chief Justice, in delivering the opinion of the court said: "the owner * * * who derives profit from the concern," (not necessarily from the publication of the particular liabel) "and who furnishes the means to carry on the concern and who entrusts the conduct of the publication" (of

the newspaper) "to one whom he selects and in whom he confides, ought to be answerable, even criminally, although it cannot be shown that he was individually concerned *in the particular publication.* It would be exceedingly dangerous to hold otherwise, for then an irresponsible person might be put forward, and the person really producing the publication and without whom it could not be published, might remain behind and escape altogether. (Italics supplied.) To the same effect *Rex* v. *Walter*, 3 Esp. 21, *Com'th* v. *Morgan*, 107 Mass. 109, prosecution for libel; *Perret* v. *New Orleans Times Newspaper*, 25 La. Ann. 170, action of slander; *Storey* v. *Wallace*, 60 Ill. 51, action for libel.

In *Wolf* v. *Mills*, 56 Ill. 360 (which was an action for deceit) a partnership was held liable for the fraudulent conduct of one of the partners, without the participation or knowledge of the other partner in the fraud. The tort was committed in the sale of a lot of sheep skins *"in the course of the partnership business."* (Italics supplied).

In *Chester* v. *Dickerson*, 54 N. Y. 1, 13 Am. Rep. 550 (which was an action for deceit), a real estate partnership was held liable for the fraud of one of the partners (the other partners having "no connection with, knowledge of or participation in the fraud"). The fraud was committed in a sale of land, it being "in the *transaction* and *prosecution of a partnership enterprise."* (Italics supplied.)

In *Linton* v. *Hurley*, 14 Gray (Mass.) 191 (which was an action for personal injury occasioned by the negligence of one of the partners, or of servants employed by the firm in the unloading of the vessel which the firm had contracted to unload), the partnership was held liable, although one of the partners was absent when the accident occurred and had no knowledge of and did not participate in the negligent manner of doing the work. (These facts and the resultant holding of the court, so familiar in negligence cases, are cited here merely to illustrate what guidance may be

obtained from the rule on the same subject in the law of negligence.)    Bigelow, J., in delivering the opinion of the court, said:

"The injury was occasioned either by the negligence of servants employed by both defendants, or by one of them, while acting *within the scope of the firm.*    Partners, like individuals, are responsible for the negligence of their servants while *engaged in the business incident to their employment;* and if one partner acts, he is considered as the servant of the rest of the firm.    *Moreton* v. *Hardern,* 4 B. & C. 223, 6 D. & R. 275; Collyer on Part., sec. 457 *et seq.;* Story on Part., 166."    (Italics supplied.)

In *Atlantic Glass Co.* v. *Paulk,* 83 Ala. 404, 3 So. 800, it does not appear what the business of the defendant partnership was nor what was the tortious act of the partner at fault.    But the court held and in its opinion said: "We entertain no doubt of the fact that there may be cases where a partnership is liable for the publication of a libel, as for other like tort, including constructive or legal malice. Of course, generally when the tort complained of is the act merely of one partner  *  *  *  in order then to render the other partners liable, the wrong complained of must be committed by such partner *in his character as partner and in the course of the partnership business.*"    (Italics supplied.)

In *Locke* v. *Stearne,* 1 Metc. (Mass.) 560, 35 Am. Dec. 382, which was an action for deceit consisting in the fraudulent sale by one of the partners, or by an employee, of a mercantile partnership, of meal as linseed meal, when it was in fact a mixture of linseed and teelseed meal, without the knowledge of the other partners, Chief Justice Shaw, in delivering the opinion of the court holding the partnership liable, said: "The deceit was done for the defendants' benefit, by their agent acting under their orders *in the conduct of their general business* and *responsible to them;* and when one party must suffer by the wrong and misconduct

of another, it is more reasonable that he should sustain the loss who reposes the confidence in the agent than he who has given no such confidence. *Hern* v. *Nichols,* 1 Salk. 289. \* \* \* it is laid down in the general rule of the common law that the principal is civilly responsible for the acts of his agent. *Doe* v. *Martin,* 4 T. R. 66. \* \* \* The rule proceeds upon the ground that the servant is proceeding within the scope of his authority, actual or constructive. The case of a sheriff who is liable *civiliter,* even in an action of trespass, for the misconduct of his deputy, is another familiar application of the rule. *Grinnell* v. *Phillips,* 1 Mass. 530. The rule is laid down generally in a recent compilation of good authority, that though a principal, in general, is not liable criminally for the act of his agent, yet he is civilly liable for the neglect, fraud, deceit or other wrongful act of his agent in *the course of his employment,* though in fact the principal did not authorize *the practice* of such acts; but the wrongful or unlawful act must be committed *in the course of the agent's employment.* 3 Chit. Law of Com. & Man., 200, 210.

"As to the other point, which is indeed little more than a further application of the same principle, it is laid down, as the general rule, that one partner is liable *civiliter* for damages sustained by the deceit or other fradulent act of his co-partner done *within the scope of the general partnership authority.* Collyer on Partnership, 241; *Rapp* v. *Latham,* 2 Barn. & Ald. 795; *Willet* v. *Chambers,* Cowp. 814." (Italics supplied.)

Other expressions of the rule on this subject found in the text books and decisions which may be helpful are as follows: "The firm is liable for the wrongful acts or omissions of a partner while he is acting *in the ordinary course of the firm's business*" (30 Cyc. 523) ; "in the course of and for the purpose of *transacting the firm's business*" (*Noblett* v. *Bartsch,* 31 Wash. 24, 71 Pac. 551, 96 Am. St. Rep. 886) ; "in the *usual and ordinary prosecution of the firm's busi-*

*ness"* (*Shapard* v. *Hynes,* 104 Fed. 349, 45 C. C. A. 271, 52 L. R. A. 675) ; "within the *proper scope* and *business of the partnership*" (Story, Part. 168) ; "a wilful tort committed by a partner *in the course* and *for the purpose of transacting the business of the firm,* may make the firm responsible." (Lindley on Part. 150, citing Pollock on Torts, 80.) (Italics supplied.)

The authorities on the subject develop the conclusion that where there is neither express authority in advance nor ratification afterwards, the test of the liability of the master or principal for the tortious act of the servant or agent, is not whether the tortious act itself—the act in the manner in which it was done—is a transaction within the ordinary course of the business of the master or principal, or within the scope of the servant's or agent's authority; but the true test is whether, if the act had been done in a non-tortious manner, the service itself, in which the tortious act was done, was within the ordinary course of such business or within the scope of such authority. That is to say, the true test is, was the service, in which the tortious act was done, incident to the employment? The master or principal is liable for the *tortious manner* in which a transaction is conducted or a service is performed, entrusted by the former to the latter to be conducted or performed for him in a non-tortious manner. The same is true, of course, as we have above seen, with respect to the liability of a partnership for a tort of an individual partner.

There can be no doubt but that much of the confusion in the authorities and difficulty experienced by the courts in the application of the general principle of the law above considered has been occasioned by the ambiguity of the word "authority," it being capable, in its narrowest sense, of a meaning having reference to the tortious act itself—which, as we have seen, is not its true meaning as sustained by the authorities, when it is used in connection with the

subject we have under consideration. This in turn has sometimes occasioned the losing sight of the true test of the liability in question above adverted to.

Another fallacy, which has found some lodgment in some of the decisions and has been retained in the text of many of the text-writers on the subject, is that whether the master or principal has in fact received a benefit from the tortious act is a test of the liability of the latter for compensatory damages. It is true that if the benefit in such case is knowingly received by the master or principal, it is a circumstance material to be considered in some cases on the point of the liability of the latter (see *Harvey Mfg. Co.* v. *Perkins,* 78 Mich. 1, 43 N. W. 1073, relied on by counsel for defendant) ; but it is material as evidence tending to show ratification, not as a test of original liability.

The reference in other cases to the benefit of the tortious act can be justified in principle only on the ground that this fact is a circumstance tending in part to show ratification. *Castle* v. *Bullard,* 23 How. 172, 16 L. Ed. 424.

But the mere receipt of a benefit is not a ratification of the tortious act from which the benefit was derived, since "ratification never takes place without knowledge." Bates on Partnership, sec. 478. Moreover, ratification of a tortious act does not always result in liability therefor. "He that agreeth to a trespass after it is done is no trespasser, unless the trespass be done for his use or benefit, and thus his agreement subsequent amounteth to a commandment." 4 Coke Inst. 317. See to same effect, *Wilson* v. *Tumman,* 6 M. & G. 236; Year Book H. 7, H. 4, fo. 34, pl. 1. The true question is, was the tortious act committed by the servant or agent in the course of his service or employment? Mere ratification then, is not itself a test of liability of one for the tortious act of another, much less is the receipt of a benefit from the tortious act such test, which in itself does not extend beyond being a circumstance in evidence tending in part to show ratification. Ratification is material

as bearing upon the measure of damages, as we shall see below; but is not a true test of original liability in cases such as these we are considering. The question still remains, was the tortious act committed by the servant or agent in the course of his service or employment? Was the service in which the tortious act was done incident to the employment? Which resolves itself into the same questions in another form—Was the person guilty of the tortious act engaged at the time of its commission in the discharge of the duties of a servant or agent of the master or principal sought to be held liable in damages therefor? Did the relationship of master and servant or principal and agent exist *quoad* the service in which the tortious act was done? (See opinion of this court in *Atlantic Coast Line Railroad Co.* v. *Tredway's Admr.*, 93 S. E. 560, 120 Va. 735, handed down at this term of court, on the subject of when this relationship exists in negligence cases.) If the act in question falls within this definition, the master or principal is liable in damages, regardless of whether the act was in fact beneficial to the latter or the contrary. *White* v. *Sawyer*, 16 Gray (Mass.) 586, a case of partnership; *Aldrich* v. *Press Printing Co.*, 9 Minn. 133 (Gil. 123), 86 Am. Dec. 84, case of a corporation. As the learned author of Bates on Partnership, section 478, correctly says, on the subject of receipt of benefit being a ground of liability *ex delicto*: " *   *   * this ground is not the true one." If it were, the more wanton the act, although done by the servant or agent in the course of his employment, the less likelihood there would be any liability on the part of his master or principal. The authorities negative this consideration as a ground for the exoneration of the master or principal from liability for the tortious acts of their servants or agents.

To conclude the consideration of the subject of benefit received as a ground of liability of one for the tortious act of another: In cases where the action is in assumpsit, to recover of the master, or principal, money of the plaintiff

acquired by the former through the tortious act of his servant or agent, the true issue, indeed, is, was the benefit of the tortious act in fact received by the master or principal (as in *Durant* v. *Rogers*, 87 Ill. 508, also *Idem.* 71 Ill. 122; and in *Guillon* v. *Peterson*, 89 Pa. 163). In such cases, however, "the innocent partners are not liable *ex delicto*, but the firm is chargeable for money had and received." Bates on Partnership, sec. 478, p. 498.

Tested by the above conclusions, the tortious act complained of in the instant case, being done by one partner in the course of his conduct of the correspondence of the firm entrusted to him to conduct in a non-tortious manner, the service itself—the writing of the libelous letter to plaintiff with the purpose of obtaining from him the payment of the alleged debt due the partnership—was incident to the employment, *i. e.*, within the ordinary course of the partnership business, within the scope of the authority of the acting partner, and, hence, the firm was liable for compensatory damages for the tortious manner in which the latter conducted such correspondence.

The instant case presents no difficulty on the question of whether the tortious act was committed in the ordinary course of the business of the principal—*i. e.*, in the discharge of the duties of a servant or agent of the master or principal; *i. e.*, in a service incident to the employment—in short, whether the relationship of master and servant, or of principal and agent, existed *quoad* the business in the performance of which the tortious act was committed. There are cases, however, where the border line between what should be considered the business of the master—what is embraced within "the ordinary course of business" of the master or principal—becomes very indistinct and difficult of ascertainment. Manifestly there may be cases where the individual action of the general agent or servant is so out of the ordinary course of the business of his principal or master that it is evident he acted individually,

outside of the relationship of principal and agent, or of master and servant, that the act was not done in the name of the principal or master or for his use; and in such cases the act is regarded as that of the individual and not that of the principal or master. On such ground the decisions rest in the cases of *Gilbert* v. *Emmons,* 42 Ill. 143, 89 Am. Dec. 412; *Petrie* v. *Lamont,* 1 Car. & March, 57; *Grund* v. *Van Vleck,* 69 Ill. 479; *Titcomb, &c.* v. *James,* 57 Ill. App. 296; *Woodling* v. *Knickerbocker,* 31 Minn. 268, 17 N. W. 387—cited and relied on by counsel for defendants. In principle, in such cases, the ratification of the tortious act by the master, or principal, would not have rendered the latter liable therefor. 4 Coke Inst. 317; *Grund* v. *Van Vleck, supra; Wilson* v. *Tumman, supra; Year Book,* 7 H., *supra.* The decisions of cases, on the one side or the other of the border line adverted to, are not all in accord; or reconcilable, indeed, on principle (see collation of some of such character of cases in Bates on Partnership, secs. 465, 466) ; but, as above stated, the principle involved is not left in doubt by the authorities and the application of it is without difficulty in the instant case.

Hence, as above stated, the court below committed no error in giving instruction No. 1 asked for by the plaintiff.

2. The court below correctly refused to give instruction No. 1, asked for by the defendants, because there was no evidence to support it, and it was contrary to all the evidence on the subject. The evidence for defendants themselves on this point was all to the effect that the tortious act of Jandorff was "within the scope of the partnership business," as we have above seen.

3. The court below committed no error in refusing to give instruction No. 4, asked for by the defendants.

As stated by 8 R. C. L., sec. 142: "There is some conflict in the authorities as to when and how far a principal or master is liable for exemplary or punitive damages for the torts of his agent or servant. Some courts hold that the

principal or master is never liable for exemplary damages under such circumstances, while others hold that he is liable where he has authorized or ratified the act of the agent or servant, but not otherwise. Still another line of authorities is to the effect that the principal or master is liable for such damages regardless of whether or not he has authorized or ratified the act of his servant or agent."

The rule on this subject in Virginia has been firmly established, and is that the principal or master is liable when he has previously authorized or subsequently ratified the tortious act of the agent or servant. *N. & W. R. Co.* v. *Lipscomb,* 90 Va. 137, 17 S. E. 809; 20 L. R. A. 817; *Southern Ry. Co.* v. *Grubbs,* 115 Va. 876, 80 S. E. 749. And the rule seems to be supported by the great weight of authority.

Regarding the evidence in the instant case, as we must regard it, the jury may have found, and hence we must find, as appears from the statement of facts above, that the innocent defendant partner subsequently ratified the tortious act of the other defendant partner. Hence, the trial court correctly refused to give the instruction under consideration.

4. There was error in the action of the court below in giving instruction No. 2, as asked for by the plaintiff, but we must regard this as harmless error in the instant case.

As an abstract proposition, it was error to instruct the jury that, if they found the defendant liable for damages, they might award exemplary damages. As we have above noted, the rule in this State is that the principal or master is liable for compensatory damages only for the tortious act of his agent or servant, unless he previously authorized or subsequently ratified the tortious act. In the instant case, however, as we have also noted above, we must regard the tortious act in question as having been subsequently ratified by the innocent defendant partner, and hence it is evident that had the instruction under consideration contained the correct limitation, to the effect that the jury could not award exemplary damages against the firm

unless they believed from the evidence that the tortious act of Jandorf was subsequently ratified by the other defendant partner, the same verdict might have been rendered. Hence, it does not affirmatively appear that the error in question was injurious, and under the rule established in *Standard Paint Co.* v. *Vietor,* 91 S. E. 752, 120 Va. 595, we must regard the error as harmless. Moreover, the error of the trial court in this particular was invited by instruction No. 5 asked for by defendant and given by the court, which was erroneous for lack of the same limitation above referred to. The case was tried in the court below on this point, as asked for by both parties, defendants as well as plaintiff, to the effect that the jury should go without any express limitation in the instructions such as we have under consideration; and it is now too late for the defendants to avail themselves in an appellate court of such omission.

We come now to the consideration of the action of the trial court in—

Admitting certain testimony over the objection of the defendants.

This testimony appears from Bill of Exception No. 5, copied in the "Statement of the Case and Facts" given above.

The libel alleged in both counts of the declaration in the instant case was actionable *per se.* The plaintiff, therefore, was entitled to recover substantial, and even punitive damages, without any proof of particular instances of special damage. This is because the law presumes general damages where the libel is actionable *per se.* Newell on L. & S., p. 1043, sec. 1018, p. 1047, secs. 1020, 1024. The plaintiff accordingly introduced no proof whatever of any special damage. It was by the defendants that the testimony objected to was elicited by their question on cross-examination. If the defendants were not content to let the case stand upon the general damages presumed by law in such a case, but wished to attempt to rebut this presumption by

asking the question as to what actual injury the plaintiff had in fact sustained by the libel, they had the right to do this, in diminution of damages. Having asked the question, they cannot sustain their objection to the answer, which was in direct response to the question as far as it went.

We have now only to dispose of the remaining question, whether there was error in the action of the court below in—

Refusing to set aside the verdict of the jury and grant the defendants a new trial.

The same reasons are urged upon this point by counsel for defendants as those considered above in connection with the assignments of error with respect to the other actions of the trial court excepted to. Hence, what has been above said disposes also of this question adversely to the defendants.

For the foregoing reasons, we find no error in the action of the trial court or in the judgment complained of, and such judgment will be affirmed.

said disposes also of this question adversely to the defendants. For the foregoing reasons, we find no error in the action of the trial court or in the judgment complained of, and such judgment will be affirmed.

*Affirmed.*