PRESENT: All the Justices

OUR LADY OF PEACE, INC.

v. Record No. 180736

BARBARA MORGAN, ADMINISTRATOR
OF THE ESTATE OF GERTRUDE AUSTIN,
DECEASED, ET AL.

OPINION BY
JUSTICE D. ARTHUR KELSEY
AUGUST 30, 2019

FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
Cheryl V. Higgins, Judge

A nursing assistant molested and raped an 85-year-old resident at a nursing home. The administrator of the resident's estate sued the nursing assistant and the nursing home. The jury returned a verdict against both defendants. On appeal, the nursing home argues that the trial court erred in holding, prior to trial (and also by instructing the jury at trial), that the nursing assistant had committed the molestation and rape while acting within the scope of his employment. The nursing home also contends that the trial court made erroneous evidentiary rulings regarding the admissibility of expert testimony. For the reasons that follow, we reverse the final judgment and remand the case for retrial.

I.

In 2015, the Administrator of the Estate of Gertrude Austin ("the Estate") filed a complaint against a nursing assistant, Martin Matthews Martin, and Our Lady of Peace, Inc., the nursing home at which Martin worked. In 2013, Austin was a resident at Our Lady of Peace. At that time, "she was weak, ill, partially paralyzed, helpless, and unable to cry out for help." 1 J.A. at 2. As a nursing assistant, Martin's duties included, among other things, undressing residents, changing their undergarments and diapers, as well as bathing them. *See id.* To perform these tasks, Martin had access to the residents' rooms and could pull a privacy curtain around a resident while performing his duties.

One morning in August 2013, Martin "entered Gertrude Austin's room and undertook to provide care to her with the door closed and the privacy curtains drawn, with no one else present in the room except Gertrude Austin's disabled roommate." *Id.* at 3. At that time, Austin was bedridden, non-communicative, and nourished by a feeding tube. Martin allegedly entered the room with the intent to perform his assigned duties. *See id.* Once there, while "*performing* his duties . . . in the course and scope of his employment . . . , Martin engaged in wrongful conduct that included, but was not limited to, raping" Austin as she lay incapacitated on her bed. *Id.* (emphasis added). In addition to rape, Martin's wrongful conduct included "acts of touching, sexually abusing, and molesting" Austin. *Id.* at 4. At some point, another employee entered the room, briefly observed some aspect of this conduct, and later (how long was in dispute) reported what she saw to an on-call supervisor.

The Estate filed suit against Martin and Our Lady of Peace.[1] Against Our Lady of Peace, the Estate asserted various theories of recovery: (i) vicarious liability under respondeat superior principles for Martin's assault and battery; (ii) negligent hiring and retention of Martin; (iii) negligent operation of the nursing home; (iv) special-relationship liability arising out of Our Lady of Peace's negligent failure to protect Austin from sexual assault; (v) negligence liability arising out of an assumption of tort duties; and (vi) negligent training, management, and supervision of Our Lady of Peace's employees. The Estate also sought punitive damages.

Among Our Lady of Peace's responsive pleadings was a plea in bar challenging the Estate's allegations of respondeat superior liability for Martin's molestation and rape of Austin. At the plea-in-bar hearing, Our Lady of Peace called its Executive Director as its only witness.

---

[1] The complaint also named Medical Facilities of America LXVIII d/b/a Charlottesville Health & Rehabilitation Center and Coordinated Services Management, Inc. as defendants. The Estate later nonsuited these defendants.

She offered no testimony or documentary evidence describing any factual aspect of Martin's molestation and rape of Austin. Instead, she generally described Our Lady of Peace's policies and practices, the regulations to which it was subject, the role of nursing assistants, Martin's employment record, and the medical and daily-activity assistance provided to Austin.

The Estate offered no testimony or evidence during the plea-in-bar hearing. Regarding Our Lady of Peace's plea in bar, the Estate took the position that, though the pleading "ha[d] been filed as a plea in bar, . . . essentially it is a demurrer." *Id.* at 174. "There have been *no facts* provided through the plea in bar," the Estate argued, "other than Our Lady of the Peace has regulations that they have to follow." *Id.* (emphasis added). "It just doesn't follow," the Estate continued, that Martin was acting outside the scope of his employment simply because he "didn't follow those regulations." *Id.* The Estate repeated this point during oral argument on appeal, conceding that "what was alleged in the complaint . . . was all the evidence that was before the court on the plea in bar" on the disputed issue of vicarious liability. Oral Argument Audio at 16:24 to 16:30; *see also* Appellee's Br. at 6-7, 21, 28-29 (describing the absence of evidence and Our Lady of Peace's concession on the issue).

This argument was the Estate's main focus at the plea-in-bar hearing: "[O]ur allegation is that [Martin] was in the course and scope of the employment" and "that the burden then shifts to the defense to put on evidence that he was beyond the course and scope, *and that that is a jury issue*." 1 J.A. at 174 (emphasis added). Virginia law, the Estate insisted, "has been clear that it's a jury issue, whether or not it's course and scope," which is why the trial court should "allow the case to proceed to the jury." *Id.*; *see also id.* at 175 (arguing that "if the evidence leads to question and doubt," the scope-of-employment issue "becomes an issue to be determined by the jury" (citation omitted)). "I submit to you," counsel advised the trial court, "all we needed to do

3

was plead that [Martin] was an employee and in the course and scope of his employment. And then the burden is shifted for the defense to convince a jury why he was not in the course and scope." *Id.* at 175. "So that's our position," counsel concluded. *Id.*[2]

At the plea-in-bar hearing, the trial court seemed to agree with the Estate, asking from the bench after counsel for Our Lady of Peace had described Martin's services as ending before the rape, "And for the plea in bar, how do I know that?" *Id.* at 172. The court then took the plea in bar under advisement. Four months later, the court issued an order denying the plea in bar along with a letter opinion explaining that it was "rul[ing] based upon the rational[e] provided in" *Plummer v. Center Psychiatrists, Ltd.*, 252 Va. 233 (1996), an opinion reversing a trial court's grant of a demurrer and directing that the disputed scope-of-employment issue be resolved by the jury on remand. *See* 1 J.A. at 107. While citing *Plummer*, however, the trial court appeared to

---

[2] The Estate repeated this argument at length in its brief opposing the plea in bar:

- "The matter of the scope of Martin's employment simply is not ripe for this Court's review at this time." 1 J.A. at 97.
- "[Our Lady of Peace's] . . . argument regarding course and scope is premature and not properly raised at this time." *Id.* at 98.
- "[Our Lady of Peace] . . . ha[s] not offered any authority for the proposition that this issue can be properly resolved by the [c]ourt in this case at this stage of the proceedings." *Id.*
- "The Estate of Austin has made out a prima facie case of [Our Lady of Peace's] vicarious liability, and it will be [Our Lady of Peace's] burden at trial to prove that Martin acted outside the scope of his employment." *Id.* at 99.
- "In [responding to Our Lady of Peace's arguments], The Estate of Austin is not conceding that the [c]ourt needs to consider these additional arguments at this time, o*r that it is even proper to do so*." *Id.* (emphasis added).
- "When the time comes" — that is, when the jury sits as factfinder — "the proper test will be 'whether the service itself, in which the tortious act was done, was within the ordinary course of the employer's business.'" *Id.* at 101 (citation omitted).
- "[T]here is enough evidence for the case to be decided by a jury." *Id.* at 102.

go beyond the holding in that case by ruling on the merits that "Martin's willful and malicious acts were committed while he was performing duties at Our Lady of Peace and in execution of those services for which he was employed," *id.*

The order, which the Estate had proffered, expressly repeated that "Martin's acts were committed while he was performing duties of Our Lady of Peace and in execution of those services for which he was employed," *id.* at 207. The order also contained this sentence: "The [c]ourt finds that Mr. Martin was in the course and scope of his employment when he committed the rape of Mrs. Austin." *Id.* Our Lady of Peace objected to this sentence in part because it was "not in the judge's letter opinion." *Id.* at 204. In response, the court crossed out this sentence "just to make sure that the [c]ourt follows the language that was set forth in the opinion letter," *id.*, while leaving in the near-verbatim quotation from that prior letter opinion. *See id.* at 207. The pertinent portion of the order reads:

> As to that Plea in Bar, the [c]ourt heard evidence and argument and finds that Mr. Martin's acts were committed while he was performing duties of Our Lady of Peace and in execution of those services for which he was employed. ~~The Court finds that Mr. Martin was in the course and scope of his employment when he committed the rape of Mrs. Austin.~~

*Id.*

Prior to trial, the Estate filed a motion in limine and argued that the trial court should preclude Our Lady of Peace from presenting any evidence challenging the respondeat superior finding. According to the Estate, the trial court had held, in its plea-in-bar ruling, that "the issue of course and scope of employment ha[d] been decided," and therefore, Our Lady of Peace should be precluded "from presenting any evidence inconsistent with the [c]ourt's ruling." *Id.* at 117. Taking a position opposite to the one that it had taken at the plea-in-bar hearing, the Estate insisted that the scope-of-employment question did not involve an issue of fact for the jury. "It is

5

disingenuous," the Estate argued, "for [Our Lady of Peace] to now claim the issue should be decided by a jury simply because it disagrees with the [c]ourt's ruling on the matter." *Id.* at 118. The Estate did not explain how the trial court could have decided the scope-of-employment issue without having heard any evidence on it.

In reply, Our Lady of Peace correctly recalled that, before the plea-in-bar hearing, the Estate had taken the position "that whether Mr. Martin's conduct is within the scope of employment is a jury issue that cannot be decided by the court." *Id.* at 123. "On brief," the Estate had contended "that a defendant's failure to meet the burden of proof requires the scope of employment issue to be heard by a jury." *Id.*

The trial court granted the motion in limine, holding that the scope-of-employment issue had been properly before the court at the plea-in-bar hearing, was ripe for the trial court to decide pretrial, and thus, was not a question of fact for the jury. The court barred Our Lady of Peace from presenting any evidence at trial suggesting that Martin had acted outside the scope of his employment when he molested and raped Austin. The trial court explained: "[T]he [c]ourt finds, on the merits, and as a clarification of its prior ruling, that . . . Martin's acts were committed within the course and scope of his employment with [Our Lady of Peace]." *Id.* at 211. Like the Estate, however, the court never explained how it could have decided a dispute concerning vicarious liability on the merits by relying solely on the allegations of a complaint.

After the Estate had filed an amended complaint that contained counts of vicarious liability against Our Lady of Peace for assault and battery, vicarious liability against Our Lady of Peace for negligence in caring for and protecting Austin, and direct liability against Our Lady of Peace for negligence in caring for and protecting Austin, the case proceeded to a jury trial. True to its "clarification," *id.*, the trial court enforced its ruling on the motion in limine by precluding

6

Our Lady of Peace from presenting evidence contesting vicarious liability. To ensure that the jurors understood that vicarious liability was not a factual issue for their consideration, the court gave a jury instruction stating that the matter had been resolved prior to trial:

> In order to recover against Our Lady of Peace for Martin Matthews Martin's acts or omissions, the *plaintiff has the burden of proving by the greater weight of the evidence* that Martin Matthews Martin was an *employee* of Our Lady of Peace; that [he] . . . committed a battery and/or assault *while acting within the scope of his employment*; and that this . . . battery and/or assault proximately caused damage to Gertrude Austin.
>
> *The [c]ourt has determined that Martin Matthews Martin was an employee of Our Lady of Peace and was acting within the scope of his employment.*

*Id.* at 334 (emphases added). At trial, however, facts bearing on the vicarious liability issue were presented because they were relevant to Martin's personal liability. For example, Martin's confession in his criminal case was introduced into evidence. Aspects of this confession would have been relevant to the scope-of-employment issue if the trial court had not decided the issue prior to trial.

The trial court also made two evidentiary rulings that Our Lady of Peace contests on appeal. First, it excluded testimony from a licensed nursing-home administrator who Our Lady of Peace had offered "as an expert in standard of care for skilled nursing facilities in relation to employment issues and dealing with staff care issues and training, and those matters," 2 *id.* at 648-49. The court found that the expert did not have an "active clinical practice" as required by Code § 8.01-581.20(A) because supervising and administering a nursing home does not constitute a clinical practice.

Second, the trial court refused to exclude testimony by the Estate's expert to the effect that Martin's actions had violated the standard of care governing nursing assistants. Among other things, Our Lady of Peace argued that the expert should not be allowed to testify on such

7

matters because they were within the common knowledge of the jury. The court held that the proposed testimony was within the jurors' common knowledge but nonetheless held that the expert would be allowed to testify on these matters. *See* 2 J.A. at 446-48.

At the end of trial, the parties proposed a general verdict form that did not make any distinction between the direct-negligence claim against Our Lady of Peace and the two vicarious liability claims against Our Lady of Peace. When the trial court questioned counsel about the verdict form, counsel for the Estate confirmed that offering a general verdict form "was an intentional decision" and that the verdict form was an "agreed upon verdict form." *Id.* at 697. Counsel for Our Lady of Peace said nothing to contradict this assertion.[3]

During jury deliberations, the jurors presented a handwritten question to the court: "Is an employer equally liable as the employee when the employee engages in a criminal act?" *Id.* at 698. The court answered by referring the jury to the previously given instructions. Using the general verdict form, the jury found Our Lady of Peace and Martin liable and awarded the Estate $1,750,000 in damages. After a round of unsuccessful post-trial motions by Our Lady of Peace and Martin, the trial court entered final judgment against them pursuant to the jury verdict. Both Martin and Our Lady of Peace filed petitions for appeal. We granted only Our Lady of Peace's petition.

## II.

### A. RESPONDEAT SUPERIOR LIABILITY FOR MARTIN'S CONDUCT

On appeal, Our Lady of Peace first argues that the trial court erred in holding, based solely upon the allegations of the original complaint, that Martin had committed the molestation

---

[3] Counsel for Our Lady of Peace only stated: "It would be difficult for me to respond, Your Honor, without injecting insurance into this." 2 J.A. at 697.

and rape within the scope of his employment. In *Parker v. Carilion Clinic*, we restated the short-form version of the doctrine of respondeat superior: "[A]n employer is liable for the tortious act of his employee if the employee was performing his employer's business and acting within the scope of his employment." 296 Va. 319, 335 (2018) (citation omitted). We also observed that the "low-resolution" nature of this axiom leads to "'difficulties' in its application" and often presents "conceptually 'vexatious'" and "perplexing" questions. *Id.* (citations omitted). Acknowledging these criticisms, we sought to recapture the "first principles" of respondeat superior and to eliminate some of the "doctrinal vagaries" that had crept into our jurisprudence on this issue, *id.* at 336 (citation omitted).

"In Virginia," we explained, "the first principle of respondeat superior is that vicarious liability may be imposed on an employer when 'the *service itself*, in which the tortious act was done, was within the ordinary course of the employer's business,'" meaning "when the employee committed the tort while 'performing a normal function' of his assigned job." *Id.* (emphasis in original) (alteration and citation omitted). "We have consistently applied this test in our jurisprudence." *Id.* (citation omitted).

> To put the matter succinctly, "the doctrine of respondeat superior applies only when the relation of master and servant is shown to exist between the wrongdoer and the person sought to be charged for the result of some neglect or wrong *at the time and in respect to the very transaction out of which the injury arose*." Under this job-related-service principle, while it is true that vicarious liability "is not limited to those acts of the servant which promote the object of the employment," it is equally true that no such liability can be imposed if the tortious act did not arise out of the "very transaction," or service or task, that the employee was being paid to perform.

*Id.* at 336-37 (emphasis in original) (alteration and citations omitted). In our leading cases, "the tortious act or transaction occurred *while* the employee was in fact performing a *specific job-related service* for the employer, and, but for the employee's wrongdoing, the service would

otherwise have been within the authorized scope of his employment." *Id.* at 338 (emphases in original). "It simply is not enough . . . that the claim 'arose out of an activity which was within the employee's scope of employment or within the ordinary course of business.'" *Id.* at 339 (emphasis and citation omitted). "Instead, the employee must have committed the tort *while actively engaged* in a job-related *service*." *Id.* (first emphasis added).

In *Parker*, we emphasized that "[t]he employee's motive in committing the tortious act plays a role in the job-related-service doctrine." *Id.* at 340. "For nearly a century, we have stated that respondeat superior liability cannot extend to an employer for an unauthorized tortious act by an employee arising '*wholly* from some external, independent, and personal motive on the part of the employee to do the act upon his own account.'" *Id.* (emphasis in original) (alteration and citations omitted). "Though our application of this concept has been less than consistent, our adherence to the underlying principle has not wavered." *Id.*

This motive inquiry is not novel or unusual. It "tracks analogous requirements in the second and third Restatements of Agency," which "[b]oth make clear that a servant's tortious act 'is within the scope of employment if, but only if[,] it is actuated, *at least in part*, by a purpose to serve the master'" and that "an employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve *any* purpose of the employer." *Id.* (emphases in original) (alterations and citations omitted).

This observation brings us to a nuance in the respondeat superior doctrine that deserves reemphasis. We stated in *Gina Chin & Associates v. First Union Bank* that an employee's motive in committing the tort is "not determinative." 260 Va. 533, 543 (2000). Yet we also said in both *Gina Chin* and in *Parker* that the employee's motive can be determinative in cases where the bad motive is accompanied by a "*deviation* from the employer's business" that is "marked

10

and unusual" as opposed to "slight." *Parker*, 296 Va. at 341 (emphasis added) (quoting *Gina Chin*, 260 Va. at 543-44). If the deviation "falls instead between those two extremes," we explained, "the question is for the jury." *Id.* (citation omitted). If the motive of the actor is clear and the deviation falls within one of those two extremes — with both being so factually incontestable that no reasonable juror could disagree — then the question is no longer one of fact for the jury but one of law for the court. This formula addresses the outlier scenarios on both ends, which we described as deviations that are "slight on the one hand, or marked and unusual on the other," *id.* (citation omitted).

We see some ambiguity, but no real inconsistency, in this formula for the role of motive in the respondeat superior doctrine. *Gina Chin* struck a subtle balance on the issue of motive. Its persuasive relevance turns not only on the nature of the employee's motive but on the degree to which that motive produces conduct deviating from the employer's business. Viewing motive as being dispositive "in isolation," however, skews the analysis. *Id.* at 340. Motive and conduct should be considered in tandem. In that conjoined equation, the variable of motive can be decisive in any given case.

The legal principles surveyed in *Parker* demonstrate the error of the trial court's pretrial factual finding that "Martin's acts were committed while he was performing duties of Our Lady of Peace and in execution of those services," 1 J.A. at 207. At the plea-in-bar hearing, neither party presented evidence on what specific acts Martin had committed, when he had committed them, what duties or services he had allegedly been engaged in while committing those acts, or what his motives had been. The trial court could not have made a factual finding on these issues without such facts. As the Estate argued at the plea-in-bar hearing (a position later silenced by

11

the court's letter opinion),[4] all disputed factual issues should have been decided at trial by the jury.

By deciding the scope-of-employment issue before trial and instructing the jury that the issue had already been decided against Our Lady of Peace, the trial court effectively directed a verdict against Our Lady of Peace on the vicarious liability claims without hearing a single witness on the subject. Here again, as the Estate correctly conceded, "what was alleged in the complaint . . . was all the evidence that was before the court on the plea in bar" concerning the disputed issue of vicarious liability. Oral Argument Audio at 16:24 to 16:30; *see also* Appellee's Br. at 6-7, 21, 28-29 (describing the absence of evidence and Our Lady of Peace's concession on the issue). Needless to say, factual findings cannot be made based solely upon allegations in a complaint.[5] The trial court thus erred by issuing its plea-in-bar "clarification" order, *see* 1 J.A. at 210-11, which granted the Estate's motion in limine and precluded Our Lady of Peace from introducing any evidence regarding vicarious liability, and further erred by instructing the jurors that this disputed issue was not their concern.

---

[4] The Estate's first argument was correct. In the context of this case, the plea in bar was essentially a demurrer, and those two pleadings are not the same. "A demurrer tests the legal sufficiency of" the allegations in a complaint. *Crosby v. ALG Tr., LLC*, 296 Va. 561, 567 (2018) (citation omitted). A plea in bar does not. It raises a *bar*, not a mere sufficiency challenge, to the allegations in a complaint. *See, e.g.*, *Robinson v. Nordquist*, 297 Va. ___, ___, 830 S.E.2d 36, 42 (2019) ("A plea in bar asserts a single issue, which, if proved, creates a bar to a plaintiff's recovery." (citation omitted)). Under modern practice, a plea in bar does not point out the legal insufficiency of allegations but rather demonstrates their irrelevance because of some other dispositive point — usually some affirmative defense such as the "statute of limitations, res judicata, collateral estoppel by judgment, accord and satisfaction, or statute of frauds," Kent Sinclair & Leigh B. Middleditch, Jr., Virginia Civil Procedure § 9.8, at 745 (6th ed. 2014).

[5] For this reason, we find no merit in the Estate's argument that we should defer to the trial court's factfinding, *see* Appellee's Br. at 27, 29 n.3. Factfinding presupposes a decisionmaker finding facts, not allegations. As the Estate has conceded, *see supra* at 3, 12, there were no facts presented at the plea-in-bar hearing related to the vicarious liability issue.

Our view is unaffected by the fact that, at trial, the Estate entered Martin's confession to the police into evidence. That exhibit does include evidence relevant to Martin's motives, the timing and specifics of his criminal acts, and the sequencing of his assigned duties in relation to those acts. The trial court's ruling on the Estate's motion in limine and its jury instruction, however, barred the parties from addressing the vicarious liability issue and precluded the jury from deciding it. We thus cannot, as the Estate urges,[6] take notice of this evidence or rely on it in our decision.

The question now is how to remedy the trial court's error. Our Lady of Peace contends that we should review the complaint ourselves, consider its legal sufficiency using demurrer principles, and dismiss the vicarious liability assault and battery claims as a matter of law. We disagree.

Vicarious liability claims benefit from a unique presumption that shifts the burden of production on the scope-of-employment issue to the defense once a complaint alleges the existence of an employment relationship at the time of the employee's tort. "This presumption shifts the burden of production to the employer to present facts sufficient to permit the factfinder to conclude that the employee was not acting within the scope of his employment at the time of his tortious conduct," but "the burden of persuasion stays with the employee from the start." *A.H. v. Church of God in Christ, Inc.*, Record No. 180520, 297 Va. ___, ___, 2019 WL 3821906, at *14 (Aug. 15, 2019) (alteration omitted) (quoting *Parker*, 296 Va. at 333 n.6). "This presumption applies at the outset of the case, 'beginning with the complaint, not the presentation of evidence at trial.'" *Id.* (alteration and citation omitted). At trial, however, "[t]he scope-of-

---

[6] *See* Oral Argument Audio at 17:23 to 18:11; Appellee's Br. at 29 n.3.

employment 'presumption disappears in the face of positive facts to the contrary.'" *Parker*, 296 Va. at 342 (citation omitted).

The complaint alleges an employment relationship between Martin and Our Lady of Peace at the time of the tortious conduct, thus triggering the scope-of-employment presumption. The complaint goes further, however, by alleging that Martin entered Austin's room and "undertook to provide care to her" with the intent to perform his assigned duties. *See* 1 J.A. at 3. His duties included undressing residents, changing their undergarments and diapers, as well as bathing them. While in the room, Martin allegedly committed "wrongful conduct" that included "acts of touching, sexually abusing, . . . molesting," and ultimately "raping" Austin and engaged in this conduct while "performing his duties . . . in the course and scope of his employment." *Id.* at 3-4.

Our Lady of Peace acknowledges the role of the scope-of-employment presumption but correctly points out that the rebuttal to this presumption can come from the very complaint that triggers it. *See* Appellant's Br. at 10-13. We agree and said as much in *Parker*: "A plaintiff can plead herself out of court by affirmatively alleging facts that rebut the presumption implied in law — no differently than a litigant at trial can rely on an evidentiary presumption and yet assert facts that undermine it," 296 Va. at 341. For this "self-refutation" to work, however, it "must be clear, not conjectural, and irrefutable rather than debatable." *Id.* Relying on this premise, Our Lady of Peace contends that the allegations of molestation and rape in the original complaint categorically rebut any presumption that such offenses could ever be within the scope of employment for vicarious liability purposes.

We do not believe that the self-refutation argument can succeed with respect to the allegations of Martin's "acts of touching, sexually abusing, and molesting" Austin, 1 J.A. at 4. It

14

is possible to hypothesize how such acts could occur "while the employee was in fact performing a specific job-related service for the employer" and "while [the employee was] actively engaged in a job-related service," *Parker*, 296 Va. at 338-39 (emphases omitted). Martin's job-related services included undressing residents, changing their undergarments and diapers, as well as bathing them. If Martin's acts of molestation occurred simultaneously with his performance of these job-related services, a reasonable jury could infer that he acted from a mixed motive and not "*wholly* from some external, independent, and personal motive," *id.* at 340 (emphasis in original) (citation omitted).

We have considerable difficulty saying the same for the allegation of rape. One need not be a "savvy judge," *A.H.*, 297 Va. at ___, 2019 WL 3821906, at *1 (citation omitted), to see the improbability of this violent act occurring simultaneously with any specific tasks associated with undressing Austin, changing her undergarments and diapers, or bathing her. It seems equally unlikely that Martin's motive was anything but exclusively evil when he raped Austin or that what he did was anything other than a "marked and unusual" deviation, *Parker*, 296 Va. at 341 (citation omitted), from his employer's business.

Our prior precedent, however, dictates that we hold that the specificity of the original complaint, coupled with the unique pleading presumption applicable to respondeat superior claims, precludes a finding at the pleading stage of this case that, as a matter of law, the rape was outside the scope of Martin's employment. *See Plummer*, 252 Va. at 237 (holding, in the context of a complaint alleging sexual assault, that "at this stage of the proceedings, there simply are not sufficient facts which would permit us to hold, as a matter of law, that the defendant has met its burden of showing that its employee was *not* acting within the scope of his employment" (emphasis in original)); *see also Majorana v. Crown Cent. Petroleum Corp.*, 260 Va. 521, 527

15

(2000) (applying, in a case involving a sexual assault, *Plummer*'s holding that the trial court erred in finding the act outside the scope of employment based solely upon the pleadings). Here, the original complaint expressly alleges that all of Martin's wrongful acts — including the rape — occurred *while* he was performing job-related services within the scope of his employment.[7] This simultaneity allegation, to be sure, is just that, an allegation. But when reinforced by the presumption applicable to respondeat superior claims, *see A.H.*, 297 Va. at ___, 2019 WL 3821906, at *14, it is sufficient, though barely so, to survive the pleading stage of this unique case.[8]

### B. EVIDENTIARY RULINGS

Our Lady of Peace also challenges two of the trial court's evidentiary rulings: (i) the trial court's decision to preclude Our Lady of Peace's standard-of-care expert, a licensed nursing-home administrator, from testifying because he did not have an "active clinical practice" required by Code § 8.01-581.20(A); and (ii) the trial court's decision to admit testimony from the Estate's expert regarding Martin's conduct constituting a breach of the standard of care.

### 1. *Our Lady of Peace's Expert*

Though this Court "generally review[s] evidentiary rulings under an abuse of discretion standard," when the admissibility of testimony depends upon the interpretation of a statute, the

---

[7] The amended complaint repeats this allegation. *See* 1 J.A. at 215-16.

[8] Averments and proof on a plea in bar should be examined claim by claim. *See, e.g.*, *Campbell v. Johnson*, 203 Va. 43, 46-48 (1961) (focusing on distinct claims raised in a complaint). As we have often stated, when a trial court hears no evidence on a matter raised in a plea in bar, "the trial court, and the appellate court upon review, must rely solely upon the pleadings in resolving the issue presented." *Tomlin v. McKenzie*, 251 Va. 478, 480 (1996); *see Lostrangio v. Laingford*, 261 Va. 495, 497 (2001); *Weichert Co. of Va. v. First Commercial Bank*, 246 Va. 108, 109 (1993). "When considering the pleadings, 'the facts stated in the plaintiffs' [complaint] are deemed true.'" *Tomlin*, 251 Va. at 480 (alteration omitted) (quoting *Glascock v. Laserna*, 247 Va. 108, 109 (1994)).

question is one of law that we review de novo. *Jones v. Williams*, 280 Va. 635, 638 (2010) (citation omitted). In particular, Our Lady of Peace contends that the trial court erroneously interpreted and applied Code § 8.01-581.20(A), which states, in relevant part:

> A witness shall be qualified to testify as an expert on the standard of care if he demonstrates expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards and if he has had active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action.

The statute does not define the term "active clinical practice," but the concluding sentence of subsection A states, "The provisions of this section shall apply to expert witnesses testifying on the standard of care as it relates to professional services in nursing homes." Code § 8.01-581.20(A).[9]

The Code also defines "Health care" to include "any act, professional services in nursing homes, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider" and in turn defines a "Health care provider" to include "a nursing home" and "a director, officer, employee, independent contractor, or agent of" such nursing home. Code § 8.01-581.1. The specific inclusion of nursing homes, their services, and their directors and employees in the definitions of "Health care" and "Health care provider," *id.*, lends

---

[9] The Estate argues on appeal that Our Lady of Peace failed to preserve its argument with respect to this expert's testimony by failing to proffer the substance of that testimony. *See* Appellee's Br. 33-34. The Estate asserts that, in addition to not proffering a summary of this expert's expected testimony, Our Lady of Peace "never even referred the court to its expert disclosure or made that disclosure part of the trial record as a place to look for a summary of [the expert's] expected testimony and opinions." *Id.* at 33. However, as Our Lady of Peace points out, *see* Reply Br. at 10-11, it offered to the trial court a copy of the expert disclosure, which contained a description of the expert's anticipated testimony, and the court stated that it did not need the designation at that time and instructed counsel for Our Lady of Peace to leave the designation with the bailiff. *See* 2 J.A. at 659-60. Thus, we find no merit in the contention that the issue of the admissibility of this expert's testimony was not properly preserved below.

strong support to the conclusion that the legislature intended nursing-home administrators to constitute those with "active clinical practice" qualified to offer expert testimony regarding the standard of care for professional services in nursing homes, Code § 8.01-581.20(A). The trial court thus improperly found that Our Lady of Peace's expert did not have an "active clinical practice" as required by the statute, *id.*[10]

### 2. *The Estate's Expert*

Our Lady of Peace argues that the trial court erred in allowing the Estate's expert to testify that several of Martin's actions — including being on top of a patient making thrusting motions, engaging in genital contact with a resident, penetrating a female resident's vagina, and raping a resident — were violations of the standard of care. According to Our Lady of Peace, these opinions were not appropriate topics for expert testimony because they were within the common knowledge of the jurors. We agree.

The trial court specifically found that the contested expert testimony was within the common knowledge of the jurors but nonetheless admitted the testimony. *See* 2 J.A. at 446-48. The court assessed the evidence correctly. It is implausible that any lay juror would think that Martin's abhorrent actions were not violations of the standard of care. That alone should have ended the admissibility analysis. "[W]hen the issue to be decided involves matters of common knowledge or those as to which the jury is as competent to form an intelligent and accurate opinion as the expert witness, expert evidence is inadmissible." *Blue Ridge Serv. Corp. of Va. v. Saxon Shoes, Inc.*, 271 Va. 206, 213 (2006); *see also Venable v. Stockner*, 200 Va. 900, 904-05

---

[10] We see no reason to question the expert's qualifications to testify regarding the standard of care in this case. At the time of trial, he was a nursing-home administrator at another facility and had been so within the requisite one-year time frame. He also had nearly 30 years of experience managing nursing homes.

(1959) (describing this principle as "well settled" and collecting cases). *See generally* Kent

Sinclair & Charles E. Friend, The Law of Evidence in Virginia § 13-6[a], at 788-94 (8th ed.

2018) (describing Virginia's adherence to this rule despite statutory reforms).

Although the trial court erred in admitting the expert testimony, we find that the error was

harmless. Any error that does not implicate the trial court's subject matter jurisdiction is subject

to harmless-error analysis because "Code § 8.01-678 makes 'harmless-error review required in

all cases.'" *Commonwealth v. White*, 293 Va. 411, 420 (2017) (emphasis and citation omitted).

Absent an error of constitutional magnitude, "no judgment shall be arrested or reversed" when

"it plainly appears from the record and the evidence given at the trial that the parties have had a

fair trial on the merits and substantial justice has been reached." Code § 8.01-678. "The

harmless-error check on judicial power has never been a begrudged limitation, but rather one

'favored' by Virginia courts," *White*, 293 Va. at 420 (citation omitted), because it stems from the

"imperative demands of common sense," *Oliver v. Commonwealth*, 151 Va. 533, 541 (1928).

Applying the "imperative demands of common sense," *id.*, we cannot say that the

testimony of the Estate's expert affected the outcome of the case.[11] It is wholly implausible that

the jurors would not have known that Martin's actions were violations of the standard of care

without an expert telling them so. Therefore, while the error should not be repeated on remand,

it does not serve as a predicate for reversing the final judgment now before us. The admission of

expert testimony on matters within the common knowledge of the jury may not "be of sufficient

---

[11] *See, e.g.*, *Peters v. Shortt*, 214 Va. 399, 404 (1973) (stating that such error in admitting expert testimony was "rendered harmless by the other evidence in the case"); *Virginia Iron, Coal & Coke Co. v. Tomlinson*, 104 Va. 249, 254 (1905) (finding the admission of such evidence harmless); *Lane Bros. v. Bauserman*, 103 Va. 146, 155 (1904) (same).

import to constitute reversible error," but such evidence "should not be admitted at a new trial." *Hill v. Lee*, 209 Va. 569, 573 (1969).

## III.

The trial court erred in removing the scope-of-employment issue from the jury based upon its ruling on Our Lady of Peace's plea in bar, which it later implemented through its ruling on the motion in limine and through its jury instruction. The court also erred in excluding Our Lady of Peace's expert witness and in admitting the challenged testimony of the Estate's expert witness. For these reasons, we reverse the trial court's final judgment and remand this case for further proceedings consistent with this opinion.

*Reversed and remanded.*

JUSTICE McCULLOUGH, with whom JUSTICE McCLANAHAN joins, concurring.

Constrained by our precedent, I join the majority opinion. The point that gives me the most difficulty is the question of whether an employer can be held liable when an employee commits a rape.

> A master is not liable for every wrong which a servant may commit during the continuance of an employment. The master is responsible only when it can be said that the servant was in the course of his employment when the injury was done. If the servant steps aside from his master's business and is engaged in an independent venture of his own, the relation of master and servant is for the time suspended.

*McNeill v. Spindler*, 191 Va. 685, 694-95 (1950).

A Virginia jury has, and ought to have, a central role in fact-finding determinations. *See* Va. Const. Art. I § 11. Our decisions respect this role in the context of employer liability. We have consistently held that "unless the deviation from the employer's business is slight on the one hand, or marked and unusual on the other, but falls instead between those two extremes, the

20

question is for the jury." *See, e.g.*, *Parker v. Carilion Clinic*, 296 Va. 319, 341 (2018) (quoting *Gina Chin & Associates, Inc. v. First Union Bank*, 260 Va. 533, 543-44 (2000)). *See also McNeill*, 191 Va. at 695. In close cases, the jury should decide. It is hard to imagine, however, a set of circumstances under which a rape perpetrated by an employee would not belong firmly in the camp of "marked and unusual" cases for which the employer bears no legal responsibility. There exists abundant persuasive authority rejecting, as a matter of law, employer liability in comparable circumstances.[*] The plaintiff has not offered a single case to the contrary. We are

---

[*] *See Doe v. Swift*, 570 So.2d 1209, 1211-13 (Ala. 1990) (holding psychologist's sexual assault of his patient was outside the scope of his employment because it was "against all rules of his profession and [was] without any benefit to his employer"); *Porter v. Harshfield*, 948 S.W.2d 83, 85-86 (Ark. 1997) (holding radiology technician was not "by any stretch of the imagination" acting within scope of employment when, during an ultrasound for suspected gallbladder problems, he placed his mouth on the plaintiff's penis and began performing oral sex); *Regions Bank & Trust v. Stone County Skilled Nursing Facility, Inc.*, 49 S.W.3d 107, 115 (Ark. 2001) (Certified nursing assistant "was not, by any stretch of the imagination, acting within the scope of his duties as a CNA when he assaulted [a nursing home patient who was a semi-comatose quadriplegic]. Rather, [his] actions were purely personal."); *Lisa M. v. Henry Mayo Newhall Memorial Hospital*, 907 P.2d 358, 363-66 (Cal. 1995) (explaining that "deliberate, independently motivated" sexual molestation of patient by ultrasound technician during examination did not involve an act within the scope of the technician's employment); *DiTeresi v. Stamford Health Systems*, Inc., 2007 WL 901811 at *3-4 (Conn. Super. Ct. Mar. 6, 2007) (holding hospital was not vicariously liable for employee's sexual assault on 96-year-old patient suffering from dementia); *Piedmont Hospital, Inc. v. Palladino*, 580 S.E.2d 215, 218 (Ga. 2003) (When hospital employee "began manipulating [the surgical patient's] genitals, then he abandoned the hospital's interests and began pursuing his own personal, morally offensive, agenda."); *Hoover v. University of Chicago Hospitals*, 366 N.E.2d 925, 929 (Ill. App. Ct. 1977) (holding hospital was not vicariously liable for doctor's sexual assault of patient since it was "committed solely for the benefit of the doctor"); *Zsigo v. Hurley Medical Center*, 716 N.W.2d 220, 229 (Mich. 2006) (ruling medical center was not vicariously liable for nursing assistant's sexual assault of patient who was in restraints); *N.X. v. Cabrini Medical Center*, 765 N.E.2d 844, 847 (N.Y. 2002) ("A sexual assault perpetrated by a hospital employee is not in furtherance of hospital business and is a clear departure from the scope of employment, having been committed for wholly personal motives."); *G.L. v. Kaiser Foundation Hospitals, Inc.*, 757 P.2d 1347, 1350 (Or. 1988) (holding hospital was not vicariously liable for sexual assault by respiratory therapist on an unconscious patient); *Buck v. Blum*, 130 S.W.3d 285, 289-90 (Tex. Ct. App. 2004) (holding neurologist performing behind-the back arm-strength test was not acting within scope of employment when he placed his penis in the patient's hand and told her to squeeze it); *Birkner v. Salt Lake County*, 771 P.2d 1053, 1057-59 (Utah 1989) (holding mental health facility not vicariously liable for

not asked to reconsider any aberrant precedent, and the majority properly declines to undertake the exercise *sua sponte*.

Our jurisprudence favors resolution of contested factual matters by juries, but it does not abdicate judicial oversight over claims that have no possible basis in any intelligible conception of the doctrine of *respondeat superior*.


JUSTICE MIMS, with whom JUSTICE POWELL joins, concurring in part and dissenting in part.

Our Lady of Peace sought to resolve the Estate's respondeat superior claim without the hassle of trial via a plea in bar. When it failed to present adequate evidence to rebut the scope-of-employment presumption during the plea-in-bar hearing and thus lost on that issue, it adopted the inconsistent position that scope-of-employment was a jury issue to be resolved at trial. The trial court rejected this position. The majority excuses this misstep. The majority also continues this Court's recent and concerning trend of giving undue—and perhaps even "determinative"—emphasis to the personal motives of employees in respondeat superior cases. Because I believe the trial court properly held Our Lady of Peace to its pleading decisions, and I believe the majority's articulation of the scope-of-employment analysis continues to unmoor that inquiry from its precedential anchor, I respectfully dissent from the majority's resolution of the Estate's respondeat superior claim.

## A. The Trial Court Properly Decided Our Lady of Peace's Plea in Bar

The majority resolves the respondeat superior claim on purely procedural grounds. It holds that the trial court erred by "effectively direct[ing] a verdict against Our Lady of Peace on

---

therapist's sexual assault because "it served solely the private and personal interests of [the therapist]").

the vicarious liability claims without hearing a single witness on the subject," faulting both parties for failing to present facts the trial court could use to make a finding. *Ante* at 12. The burden of presenting evidence at the plea-in-bar hearing, however, rested solely with Our Lady of Peace, the party that made the strategic litigation decision to submit the scope-of-employment issue to the trial court rather than a jury using a plea in bar. When Our Lady of Peace failed to meet its burden, the trial court properly resolved the scope-of-employment issue against it.

A foundational principle of the American legal system is that "[t]he litigants—not the judges—determine the issues to be decided, the facts to be presented, and the range of remedies to be sought." D. Arthur Kelsey, *Procedural Defaults: Balancing Systemic & Individual Justice*, 1 VTLAppeal 1, 1 (2012). "Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring). It "relies chiefly on the *parties* to raise significant issues and present them to the courts *in the appropriate manner* at the appropriate time for adjudication." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 356 (2006) (second emphasis added). Judges do not direct the proceedings in our legal system. Instead, judges decide cases in the form presented by, and "on the basis of facts and arguments pro and con[,] adduced by the parties." *Id.* at 357.

In this case, Our Lady of Peace elected to use a plea in bar to present the scope-of-employment issue—the question upon which the Estate's entire case hinged—without recourse to a full jury trial. Unlike a demurrer that merely challenges the sufficiency of allegations in a complaint, a plea in bar "alleges a single state of facts or circumstances (usually not disclosed or disclosed only in part by the record) which, *if proven*, constitutes an absolute defense to the claim." *Nelms v. Nelms*, 236 Va. 281, 289 (1988) (emphasis added). As with any tactical choice

23

during litigation, Our Lady of Peace's decision to use a plea in bar rather than a demurrer or other responsive pleading with regard to the scope-of-employment issue had risks and benefits. Foremost among the benefits is that a plea in bar can dramatically shorten litigation by reducing the case to a single issue. *Stanardsville Volunteer Fire Co. v. Berry*, 229 Va. 578, 586 (1985). Adding to the potential utility of a plea in bar is the fact that, even if the facts are disputed, if "no demand for a jury is made, the 'whole matter of law and fact' may be decided by the court." *Hawthorne v. VanMarter*, 279 Va. 566, 578 (2010) (quoting Code § 8.01-336(B)). Although the scope-of-employment issue was hotly contested, the parties nevertheless agreed to submit the plea to the trial court for determination. Neither party demanded a jury. *See* Code § 8.01-336(B).

Complicating the use of a plea in bar in this case are the burden-shifting presumptions endemic to vicarious liability cases. Under ordinary principles of respondeat superior, the Estate as plaintiff bears "the *burden of persuasion* on the issue whether the employee was within the scope of the employment when the act which caused the injury was committed." *Majorana v. Crown Cent. Petroleum Corp.*, 260 Va. 521, 526 (2000). Its "*burden of production* on that issue is met by establishing the employer-employee relationship at that time." *Id.* A presumption of liability exists once it establishes the employer-employee relationship. *Id.* As the majority notes, "[t]his presumption applies at the outset of the case, 'begin[ning] with the complaint, not the presentation of evidence at trial.'" *A.H. v. Church of God in Christ, Inc.*, 297 Va. ___, ___ (2019) (quoting *Parker v. Carilion Clinic*, 296 Va. 319, 334 (2018)). Once established, the presumption disappears only "in the face of positive facts to the contrary." *Parker*, 296 Va. at 342 (quoting *McNeill v. Spindler*, 191 Va. 685, 694 (1950)).

It is undisputed that an employer-employee relationship existed between Our Lady of Peace and Martin at all relevant times. The Estate was thus entitled to the presumption of liability. Because the Estate had established the presumption, the burden of production then shifted to Our Lady of Peace to present evidence rebutting that presumption "by proving that the employee had departed from the scope of the employment relationship at the time the injurious act was committed." *Majorana*, 260 Va. at 526.

Additionally, Our Lady of Peace had the burden of proof on the scope-of-employment issue because "the party asserting a plea in bar bears the burden of proof on the issue presented." *Hawthorne*, 279 Va. at 577. This burden included its burden of producing evidence to rebut the presumption because Our Lady of Peace "effectively agreed to have the judge decide all legal and factual questions underlying the single issue" by making the calculated decision to submit the entire scope-of-employment issue to the trial court using a plea in bar. *Id.* at 578.

Having thus chosen to use a plea in bar—and *not* to use a jury—Our Lady of Peace had the burden of presenting evidence sufficient to rebut the presumption of liability to prevail on the scope issue. Its evidence failed to do so for the reasons stated in the majority opinion.

At that point in the litigation, Our Lady of Peace had invited the trial court to make a finding of fact.[1] On appeal, however, Our Lady of Peace does not argue that the trial court's

---

[1] Our Lady of Peace contends that it sought to have the trial court rule that, as a matter of law, nothing in the Estate's allegations fell within the scope of Martin's employment. It is true that when "no evidence is taken in support of a plea in bar, the trial court, and the appellate court upon review, consider solely the pleadings in resolving the issue presented," *Lostrangio v. Laingford*, 261 Va. 495, 497 (2001), an inquiry that is a "pure question of law," *David White Crane Serv. v. Howell*, 282 Va. 323, 327 (2011). But Our Lady of Peace elected to introduce evidence on the plea. In doing so, it transformed the plea-in-bar hearing from a purely legal inquiry based on the pleadings to an ordinary ore tenus hearing in which the trial court received evidence and decided the issue itself. *See Cooper Indus., Inc. v. Melendez*, 260 Va. 578, 594–95 (2000).

ruling was without a factual basis. Indeed, it acknowledges on brief that it "does *not* contend that the Circuit Court 'erroneously resolved the facts.'" Nevertheless, the majority ignores the arguments Our Lady of Peace actually made and instead reverses the trial court for a reason that was not advanced in Our Lady of Peace's briefing or oral argument: that it was impossible for the trial court to reach its conclusion based on the limited evidence presented at the plea-in-bar hearing. *Ante* at 11-12.

This Court has long recognized the right-result-wrong-reason doctrine, under which it "may *uphold* a judgment even when the correct reasoning is not mentioned by a party in trial argument or by the trial court in its decision . . . [if] the record contains sufficient information to support the proper reason." *Haynes v. Haggerty*, 291 Va. 301, 305 (2016) (emphasis added). Until now, it has refrained from using a *wrong*-result-wrong-reason doctrine to *reverse* a lower court for a reason entirely absent from the record. By identifying a legal position not articulated by the appellant and then reversing on that ground, the majority usurps the litigants' role in directing the course of litigation. In doing so—and thereby rescuing Our Lady of Peace from its procedural missteps—the majority has nodded to the European legal system under which litigants cede control over their cases to judges, "depend[ing] upon them to raise the winning arguments that only the judges (so far as the decision is theirs) know in advance to be winners." Kelsey, *supra*, at 2.

The trial court had the authority to find that Our Lady of Peace failed to meet its burden of rebutting the presumption of liability. It was entitled to hold Our Lady of Peace not only to that failure, but also to the decision to litigate that issue on a plea in bar by refusing to allow Our Lady of Peace to relitigate it at trial. There is no doubt that, as the majority notes, this case is an outlier on its facts. It is also a procedural outlier. Nevertheless, Our Lady of Peace is bound by

the procedure it chose. For these reasons, I must dissent from the majority's resolution of the Estate's respondeat superior claim.

**B. The Majority's Scope-of-Employment Discussion is Dicta**

Because the majority resolves the respondeat superior issue on procedural grounds, its lengthy discussion of the job-related service doctrine as articulated in *Parker v. Carilion Clinic* and other cases is dicta. I have already presented my views on the job-related service doctrine, and particularly the role of the employee's motive in applying that doctrine, in that case. *See Parker*, 296 Va. at 350 (Mims, J., concurring). Nevertheless, because the dicta go beyond the principles articulated in our prior cases, I must address them.

The majority essentially restates the discussion of the job-related service doctrine from *Parker*, repeating the rule that an employer will not be vicariously liable for an employee's tortious acts arising "*wholly* from some external, independent, and personal motive on the part of the employee to do the act upon his own account." *Ante* at 10 (quoting *Parker*, 296 Va. at 340). In this case, as in *Parker*, the majority omits the language preceding that excerpt in the original case, which provides that an act may be within the scope of the employment relationship even if it arises "from some impulse or emotion which naturally grew out of or was incident to the attempt to perform the master's business." *Smith v. Landmark Commc'ns, Inc.*, 246 Va. 149, 151 (1993) (citing *Sayles v. Piccadilly Cafeterias, Inc.*, 242 Va. 328, 332 (1991); *Tri-State Coach Corp. v. Walsh*, 188 Va. 299, 307 (1948); *Davis v. Merrill*, 133 Va. 69, 77 (1922)). This omission reflects the Court's recent trend of considering only whether the employee tortiously performed a specific job duty within the scope of his employment, rather than looking to "whether the service itself, in which the tortious act was done, was within the ordinary course of [the employer's] business," in determining whether the alleged tortious act gives rise to vicarious

27

liability. *Gina Chin & Assocs., Inc. v. First Union Bank*, 260 Va. 533, 543 (2000) (quoting *Davis*, 113 Va. at 78). The distinction is subtle, but it has the effect of overruling sub silentio a sizeable portion of this Court's respondeat superior precedent.

This Court has traditionally rejected a myopic focus on the particular act the employee committed and instead considered whether the employer "has put the [employee] in his place to do *that class* of acts." *Henry Myers & Co. v. Lewis*, 121 Va. 50, 65 (1917) (quoting *Barwick v. English Joint Stock Co.*, L. R. 2 Exch. 259 (1867)). If so, then the employer is "answerable for *the manner* in which the agent *has conducted himself* in doing the business which it was the act of the master to *place him in*." *Id.* This approach recognizes the simple truth that when "an employee commits a willful and wrongful act that results in injury to others . . . such employee generally does not do so 'with the intent to further the employer's interest.'" *Gina Chin*, 260 Va. at 541. An employer's liability "is not limited to those acts of the servant which promote the object of the employment." *Manuel v. Cassada*, 190 Va. 906, 913 (1950). In fact, an employer may be liable even if "the conduct of the servant . . . be ill-advised or ill-tempered and detrimental to the interest of the master" as long as "the act is done during the course of the employment and incident thereto." *Id.* "If so, the master is liable though the immediate act goes beyond the servant's strict line of duty and authority and be not in the interest of the master." *Tri-State Coach Corp.*, 188 Va. at 304–05. In sum, this Court's respondeat superior precedent recognizes that "an employee's tortious act motivated by emotion or passion provoked from the very performance of the task or function that his or her employer pays him or her to do may result in the employer's vicarious liability." *Parker*, 296 Va. at 355 (Mims, J., concurring).

The majority's dicta, however, are more complex than our precedent. Essentially picking up where the discussion of motive in *Parker* left off, the majority articulates a "conjoined

28

equation" under which the "persuasive relevance [of an employee's motive] turns not only on the nature of the employee's motive but on the degree to which that motive produces conduct deviating from the employer's business." *Ante* at 11. Although this approach claims to be an application of the principles set out in *Gina Chin* and *Parker*, the majority's equation in fact expands the importance of motive beyond any of our precedent. Furthermore, trial courts attempting to use the majority's approach must consider both the employee's motive and conduct "in tandem." The majority provides little direction on how, exactly, courts should perform this analysis. It cautions against considering motive in isolation but then declares that "the variable of motive can be decisive in any given case." *Ante* at 11. The majority's conjoined equation leaves lawyers trying respondeat superior cases, judges deciding those cases, and juries charged with weighing the two variables of motive and conduct without useful guidance. It is an equation without a proof.

I fear this approach will only serve to further muddle the already "conceptually 'vexatious'" and "perplexing" analytical difficulties presented by the scope-of-employment inquiry.[2]

---

[2] This conjoined equation—and indeed, the entire discussion of the job-related service doctrine—was unnecessary to the majority's resolution of the respondeat superior claim on procedural grounds. Although "dicta are entitled to respect, especially if supported by reason," *Virginia Ry. & Power Co. v. Dressler*, 132 Va. 342, 350 (1922), we nevertheless "have always to bear in mind the oft-quoted statement of Chief Justice Marshall in *Cohens v. Virginia*":

> It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in the subsequent suit, when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in

29

Accordingly, for these reasons, I cannot join in or concur with Part II(A) of the majority opinion.

their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

*Id.* at 350–51 (citation omitted) (quoting *Cohens v. Virginia*, 19 U.S. 264, 399–400 (1821)).